JAMES S. WAHL, Appellant, v. F. J. CUNNINGHAM ET AL.—6 S. W. (2d) 576.

Court en Banc, May 18, 1928.

58

*Ward & Reeves* for appellant.

*Shepard & Hawkins* and *Moore & Fitch* for respondents.

SEDDON, C.—This is an action, commenced on October 20, 1923, to recover damages for breach of certain contracts or agreements, alleged to have been made by and between plaintiff and the two original defendants, F. J. Cunningham and John A. Cunningham. The petition is cast in two counts. The first count alleges, in substance, that for a long period prior to June 5, 1913, the Pemiscot County Bank was an organized banking corporation doing business in Caruthersville, Missouri, and its affairs were taken over by the State Bank Commissioner on June 5, 1913, and later the bank was placed in the hands of the Citizens Trust Company, as receiver, which Trust Company (at the time of the commencement of the suit) had the affairs of said Pemiscot County Bank in court and the receivership had not then been terminated; that the two original defendants, John A. Cunningham and F. J. Cunningham, at the time and long prior to the failure of said bank, were, respectively, the

president and vice-president of said bank, and, together with other named parties, were the directors of said bank; that, in the year 1913, plaintiff was elected as a member of the board of directors of said bank; that, shortly after his selection as a member of the board of directors and before plaintiff had attended a board meeting as such director, it was ascertained by the said defendants, John A. and F. J. Cunningham, that the bank was in financial distress, and later that it was in a failing condition and insolvent, because of the mismanagement, embezzlement, misuse and misappropriation of its funds by an officer of said bank during the year 1912, and prior to the time plaintiff qualified as a member of the board of directors of said bank; that, upon the discovery of the condition of said bank, "the defendants Cunningham undertook to save the bank from a complete failure and to individually raise money to tide the bank over and keep it as a going concern, and, in order to do this, defendants were required to borrow individually large sums of money, which, in turn, they were using for the use and benefit of the bank, and to prevent it from wholly failing, closing its doors and ceasing to operate as a bank; that thereupon they employed and sought the assistance and aid of this plaintiff to lend his credit to them and to help them secure such money, and thereupon advised with this plaintiff and informed him that they recognized he had been in no way connected with the operation of the bank and had not been a director and was in no way liable or responsible for the operation of the bank during the time its losses occurred, and then and there promised and agreed with plaintiff that, if he would sign notes with them or individually would borrow money for them for the use and benefit of the bank aforesaid, and assist them in raising moneys to be used by the Pemiscot County Bank, they would individually hold him harmless from any loss thereby and would individually repay to him such sum or sums as he secured and furnished as aforesaid; that thereupon this plaintiff, relying upon said agreement, statements and representations of the defendants as aforesaid, borrowed the sum of $15,000 on the — day of May, 1913, and turned said money over as directed by defendants for the use and benefit of said Pemiscot County Bank, together with $697.60 which he had on deposit in said Pemiscot County Bank, making a total of $15,697.60; that said defendants promised and agreed with the plaintiff that they would individually repay said money to him and the credit was given to the defendants, and they agreed that they would repay same to the plaintiff whenever the Pemiscot County Bank's affairs were straightened out and it was ascertained how much, if any, of the money so put up by the plaintiff had not been repaid by the Pemiscot County Bank; that plaintiff relied upon said promises and representations and agreements as aforesaid, and borrowed and furnished said money as afore-

64

said; that thereafter, on the 5th day of June, 1913, said bank was taken over by the bank commissioner .as aforesaid and since that time it has been in the process of liquidation; that plaintiff was forced to pay the note made by him in borrowing the $15,000 aforesaid, and has lost the use of the entire $15,697.60 from said — day of ——, 1913, to this date," except certain payments made thereon, either by defendants or the Pemiscot County Bank, and credited thereon, leaving the balance of $10,429.13 of the principal and all interest unpaid on said note as aforesaid, together with $697.60, money loaned as aforesaid, with six per cent interest thereon; "that defendants, at all times up until the — day of March, 1923, promised and agreed to live up to their contract as aforesaid, and to hold the plaintiff harmless and to pay the balance due for the money put up as aforesaid, whenever was finally ascertained and determined the amount thereof after the final winding up of the Pemiscot County Bank; but plaintiff charges and avers that on the — day of March, 1923, the defendants repudiated this agreement and advised this plaintiff that they were not liable and would not pay said obligation at this time, nor when the Pemiscot County Bank's affairs were finally wound up and the total amount ascertained to be due to this plaintiff;" wherefore, plaintiff prays judgment against defendants upon the first count of the petition in the sum of $11,626.75, and interest thereon.

The inducing allegations of the second count of the petition are similar to those of the first count, and it is further alleged therein that the defendants "promised and agreed with the plaintiff that, if he would sign notes with them, or individually would borrow money for them for the use and benefit of the bank aforesaid, and assist them in raising money to be used by said Pemiscot County Bank, they would individually hold him harmless from any loss thereby and would individually repay to him such sum or sums as he secured and furnished as aforesaid; that thereafter, on the 5th day of June, 1913, said Pemiscot County Bank was taken over by the bank commissioner of this State, it having been determined that it was wholly insolvent, and these defendants, in order to pay the individual depositors, or for some other reason unknown to this plaintiff, again sought the aid and assistance of this plaintiff to raise money for the use and benefit of said Pemiscot County Bank, and promised and agreed with the plaintiff herein that, if he would lend his credit and secure for them $10,000 for the purpose aforesaid, they would hold him harmless and pay to him said sum, or whatever portion thereof that was not paid by the Pemiscot County Bank when the affairs of the bank were finally settled up and the exact amount determined; that, relying upon said promises and agreement, this plaintiff did, on the 19th day of June, 1913, make to the defend-

ant F. J. Cunningham his note in the sum of $10,000, which said note the defendant F. J. Cunningham was to use in securing money for the purposes above mentioned, and did use said note for that purpose and secured thereon the sum of $10,000 under the promise and agreement with plaintiff as aforesaid; that thereafter said note was renewed from time to time and certain payments made thereon by the defendants, or out of the funds of the Pemiscot County Bank, until the 12th day of August, 1919, plaintiff paid the balance due upon said note, in the sum of $8,446.09; that same was paid upon the understanding, contract and agreement with these defendants that they would hold him harmless thereon and repay to him said sum at the time heretofore mentioned; but plaintiff charges and avers that said promises were still made by defendants and this agreement acknowledged and admitted by them up until the — day of March, 1923, and said defendants repudiated said agreement and refused to be bound thereby, and denied obligation thereon, by reason of which said sum has now become due and plaintiff is entitled to recover same from defendants;'' wherefore, judgment is prayed against defendants upon the second count of the petition in the sum of $8446.09, with interest thereon.

Defendants demurred to the petition, and to each count thereof, alleging as grounds therefor that the petition, and each count thereof, fails to state facts sufficient to constitute a cause of action against defendants; that the petition shows upon its face that the alleged causes of action are barred by the Statute of Limitations; and that the alleged promises or agreements which are the basis of plaintiff's causes of action fall within the Statute of Frauds in that the agreements are not alleged to have been made in writing, and therefore no action can be brought or maintained thereon. The demurrer being overruled, the defendants answered, denying generally the allegations of each count of the petition, and pleading as special defenses that the respective causes of action are barred by the Statute of Limitations, and that the alleged agreements fall within the Statute of Frauds and are not maintainable by suit or action. The plaintiff replied, denying generally the allegations of the answer.

The parties went to trial upon the issues raised by the petition, answer and reply, whereupon defendants, at the beginning of the trial, orally objected to the introduction of any evidence under either count of the petition upon the several grounds, (1) that the petition fails to state facts sufficient to constitute a cause of action against defendants; (2) that the alleged causes of action are barred by the Statute of Limitations, as disclosed on the face of the petition; (3) that any attempted statement of a cause of action is contrary to the Statute of Frauds in such cases made and provided; (4) that no consideration is alleged to support any promise or agreement at-

tempted to be alleged; and (5) the petition shows upon its face that, if any demand ever existed, or then existed, the demand had not matured and therefore the suit was prematurely brought or commenced.

The court overruled the defendants' objections to the introduction of any evidence. It was thereupon admitted by the parties that John A. Cunningham, one of the two original defendants, had died since the commencement of the suit; that Faris Cunningham and the Citizens Trust Company are the duly appointed and qualified administrators of the estate of John A. Cunningham, deceased; and that the cause had been revived in the names of said administrators as parties defendant. Plaintiff, in order to sustain the allegations of his petition, thereupon attempted to show by the witness, Arthur L. Oliver, an attorney, the making of the alleged promises and agreements by the original defendants, F. J. Cunningham and John A. Cunningham. Upon the general objection of defendant that the inquiry made of the witness, Oliver, called for a privileged communication and that the witness was not competent to testify to such communication, the trial court sustained the objection and refused to allow the witness to testify. The plaintiff attempted to testify as a witness in his own behalf, whereupon defendants objected to any testimony whatever by the plaintiff upon the ground that, it being alleged in the petition that the contracts and agreements, which are the basis of the suit, were made between plaintiff, on the one side, and John A. Cunningham and F. J. Cunningham, on the other side, and it being admitted that John A. Cunningham had died since the commencement of the suit, plaintiff is therefore not a competent witness respecting the contracts and agreements had by him with John A. Cunningham and F. J. Cunningham, and is not competent to testify respecting any fact in issue. The trial court sustained the objection and refused to allow plaintiff to testify as a witness in his behalf. Plaintiff offered the testimony of one Tindle, a former director and officer of the Pemiscot County Bank, tending to show the making of the alleged agreements by John A. Cunningham and F. J. Cunningham with the plaintiff.

No other or further evidence was offered by plaintiff, whereupon the trial court, at the request of defendants, instructed the jury that, under the pleadings and the evidence, their verdict should be for defendants upon both counts of the petition. The jury returned a verdict for defendants in accordance with the instructions, and judgment was entered thereon. After an unsuccessful motion for new trial, plaintiff was allowed an appeal to this court. We take jurisdiction of the appeal because the amount involved exceeds the sum of $7500.

Plaintiff (appellant) assigns error by the trial court in refusing to permit the witness, Arthur L. Oliver, to testify; in refusing to permit the plaintiff to testify as a witness in his own behalf; and in the giving of the peremptory instructions directing a verdict for defendants on both counts of the petition. Defendants (respondents) contend that the verdict and judgment are for the right parties, regardless of the errors (if any there be) assigned by plaintiff, claiming that the petition discloses upon its face that plaintiff's suit or action was prematurely brought; that plaintiff's alleged causes of action are barred by the Statute of Limitations; and that the agreements and promises alleged to have been made by defendants fall within the Statute of Frauds, that they are not alleged to have been made in writing and the testimony of the witness Tindle discloses they were made in parol, and hence no action can be brought or maintained by plaintiff thereon. If defendants are right in their contentions, then it is unnecessary to consider and rule the errors assigned by plaintiff, and the judgment below must be affirmed. If the contentions of defendants are not well founded, then the judgment below must be reversed, if substantial and material error was committed against plaintiff. We will, therefore, first discuss and rule, in their order, the several claims urged by defendants in support of the directed verdict and the judgment thereon.

I. It is urged by defendants that the allegations of the petition disclose that the suit was prematurely brought, and therefore the suit must fail. While it is alleged in both counts of the petition that the promises and agreements of the defendants were to the effect that the defendants would hold plaintiff harmless against loss and would repay to plaintiff the moneys borrowed by him, or on his credit, and advanced by him for the use and benefit of the Pemiscot County Bank, or whatever part thereof was not paid by the bank, whenever the affairs of the bank were finally wound up, settled and liquidated, and it could be determined how much, if any, of the moneys advanced by plaintiff had not been repaid by the bank, and that the bank was in process of liquidation at the time of the commencement of the suit, yet it is further alleged that the defendants, in March, 1923, prior to the commencement of the suit, repudiated the alleged promises and agreements, and advised plaintiff that they were not liable thereon and "would not pay said obligation at this time, nor when the Pemiscot County Bank's affairs were finally wound up and the total amount ascertained to be due plaintiff."

As a general rule, an action on a contract cannot be maintained until the time for performance of the contract has expired; but the rule is otherwise where, before the time for performance, one of the

68

parties renounces or repudiates the contract. [1 C. J. 1146.] The rule is thus clearly stated in 13 Corpus Juris, 651: "Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has, according to the great weight of authority, an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach."

While it appears from the allegations of the petition herein that the time for performance of the alleged agreements had not arrived when the suit was commenced, yet it is also alleged that the defendants had repudiated such agreements and advised plaintiff that they would not pay or fulfill the obligations imposed upon them thereby. Plaintiff, under such circumstances, was not obliged to await the time fixed for the performance of the agreements, but had the right to treat the agreements as broken and to bring the present action at once for recovery of his damages. Hence, it cannot be well said that plaintiff's suit or action was prematurely brought.

II. Defendants claim that the petition shows upon its face that the causes of action alleged in both counts of the petition are barred by the five-year Statute of Limitation (Sec. 1317, R. S. 1919), and, being barred by that statute, they can only be revived by a subsequent written acknowledgment or promise subscribed by the defendants (Sec. 1338, R. S. 1919), the making of which written acknowledgment or promise is not alleged in either count of the petition. While the promises and agreements relied upon by plaintiff are alleged to have been made by defendants in 1913, yet the time for the performance of said agreements, and the time for the ascertainment of the amounts due plaintiff thereunder, is alleged to be "whenever the Pemiscot County Bank's affairs were straightened out and it was ascertained how much, if any, of the money so put up by the plaintiff had not been repaid by the Pemiscot County Bank." The time for the performance of the alleged agreements had not arrived at the time of the commencement of plaintiff's suit, for it is further alleged in the petition that the affairs of the Pemiscot County Bank were then in process of liquidation and its affairs were being administered by a receiver. Defendants have apparently overlooked Section 1315, Revised Statutes 1919, of our Statute of Limitations, which provides that "civil actions . . . can only be commenced within the periods prescribed in the following sections, *after the causes of action shall have accrued*: Provided, that for the purposes of this article, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, *but when the damage resulting therefrom is sustained and is capable of ascertainment.*" (Italics ours.) As

we have said in the preceding paragraph of this opinion, if defendants repudiated their agreements before the time for performance had arrived, as alleged in the petition, plaintiff then had the option to treat the agreements as broken and at once bring an action for recovery of his damages, or to treat the repudiation as inoperative and await the time when the agreements are to be performed, and then hold defendants for all the consequences of non-performance. [13 C. J. 701.] Plaintiff elected to treat the alleged agreements as broken at the time of their repudiation by defendants, which is alleged to have occurred in March, 1923, and he commenced the instant action in October, 1923. We see no room for the application of the Statute of Limitations under the mere allegations of the petition. If plaintiff's action is barred by reason of facts appearing *aliunde* the petition, then it is the rule in most jurisdictions, including our own State, that the burden of proving that the cause of action accrued more than the statutory time before the commencement of the action rests upon the defendant who pleads the bar of the statute. [37 C. J. 1243; Johnston v. Ragan, 265 Mo. 420; Slicer v. Owens, 241 Mo. 319; Freeland v. Williamson, 220 Mo. 217.] Defendants offered no proof whatever herein, and hence did not sustain the burden resting upon them in that respect.

III. Defendants contend that the alleged promises or agreements upon which plaintiff bases his action fall within the Statute of Frauds (Sec. 2169, R. S. 1919), which provides that "no action shall be brought . . . to charge any person upon any special promise  to answer for the debt, default or miscarriage of another person, . . . unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized." Defendants assert that it appears from the allegations of the petition, and from the testimony of plaintiff's witness, Tindle, that the Pemiscot County Bank was the actual beneficiary of the moneys borrowed and furnished by plaintiff under the alleged promises or agreements, if they were made by defendants, and therefore the bank was the primary debtor, upon whom rested at least the implied obligation to pay and reimburse plaintiff for the moneys borrowed and furnished by plaintiff for the use and benefit of the bank; hence, it is urged that the implied obligation of the bank to pay and reimburse plaintiff constituted a direct and primary "debt" of the bank, within the meaning of the Statute of Frauds, and the alleged agreements, if made by defendants, merely amount to a collateral undertaking by them to answer for the "debt, default or miscarriage" of the Pemiscot

County Bank, and therefore, under the statute the agreement must be in writing to be enforcible. The petition herein does not expressly allege that the agreements or promises counted upon by plaintiff were made in writing and signed by defendants, but this court has ruled that failure of the petition expressly to allege that the promise or agreement is in writing cannot be raised by demurrer, or by a general objection to the introduction of any evidence. [Quackenboss v. Harbaugh, 298 Mo. 240, 250.] However, the testimony of the witness, Tindle, tends to show that the alleged agreements or promises of defendants were oral, and that they are not evidenced by any writing signed by defendants, or either of them, and we will so consider the alleged agreements in ruling the question at hand. Furthermore, the defendants, in their brief and argument filed herein, designate the alleged agreements as being "contracts of indemnity," and consequently we will treat the alleged agreements as properly falling within that category, which we think they unquestionably do.

Certain tests or rules have been laid down and applied by the courts in determining the question whether verbal agreements and promises fall, or do not fall, within the purview and requirements of the Statute of Frauds. One of the tests frequently and universally applied by the courts is whether the promise or agreement under consideration is an original and independent undertaking between the promisor and the promisee, or whether it is a collateral undertaking of the promisor to answer for the primary obligation, debt or default of a third person. While the terms "original" and "collateral," as applied to a promise, do not appear in the words of the statute, but have been introduced for convenience by the courts in interpreting the true meaning and operation of the statute, nevertheless it seems to have become thoroughly established by the great weight of judicial authority that, if the promise or agreement is an original and independent undertaking—i. e., one by which the promisor makes or creates a primary and direct debt or obligation of his own—it is not within the purview of the statute and need not be evidenced by a writing or memorandum signed by the promisor. The principle has been followed by this court in Sinclair v. Bradley, 52 Mo. 180; Barker v. Scudder, 56 Mo. 272; and Dyer v. Griffith, 261 S. W. 100.

However, it is sometimes a matter of some difficulty to determine whether an oral promise is an original undertaking or whether it is a collateral one, and certain tests are applied by the courts in the determination of that question. One of the tests supported by the great weight of judicial authority is: If the credit is given by the promisee to the promisor alone, the promise or agreement is an original undertaking and not within the Statute of Frauds, but if the credit is given by the promisee in any extent to a third person,

the promise of the other party is collateral and falls within the statute. The rule has been applied and followed by the courts of this State in Chick v. Coal Co., 78 Mo. App. 234, and Newton Grain Co. v. Pierce, 106 Mo. App. 200.

Another test or rule of wide judicial use and application in determining whether a promise is an original or collateral undertaking is: Whenever it appears that the leading or main purpose of the promisor is to gain some advantage for himself, or to promote some interest or purpose of his own, rather than to become the mere guarantor or surety of another's debt, and the promise is made upon a consideration beneficial to the promisor, it will be regarded as an original undertaking and not within the Statute of Frauds, although it may, in form, be a promise to pay the debt of another. So, it is said in Emerson v. Slater, 22 How. (63 U. S.) 28, that "whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability." Again, Mr. Justice BREWER, speaking for the Federal Supreme Court in Davis v. Patrick, 141 U. S. 479, 487, said: "It (the Statute of Frauds) does not apply to promises in respect to debts created at the instance and for the benefit of the promisor, but only to those by which the debt of one party is sought to be charged upon and collected from another. . . . But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal, immediate and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise. . . . The thought is, that there is a marked difference between a promise which, without any interest in the subject-matter of the promise in the promisor, is purely collateral to the obligation of a third party, and that which, though operating upon the debt of a third party, is also and mainly for the benefit of the promisor. . . . But the real character of a promise does not depend altogether upon the form of expression, but largely on the situation of the parties; and the question always is, what the parties mutually understood by the language, whether they understood it to be a collateral or a direct promise."

We will not undertake herein to cite, or comment upon, the vast number of decisions, constituting the apparent weight of judicial authority in the United States, which lay down the foregoing tests,

principles, and rules of law applicable to oral agreements of the kind and character here in question. Many of them are cited and discussed in an elaborate and instructive editorial text-note in 126 Am. St. Rep. 487 et seq., where they will be found collated.

That the agreements or promises of defendants, if made as alleged in the petition, are contracts of indemnity cannot be well gainsaid, and, as we have heretofore remarked, the defendants apparently concede such to be the nature and character of the alleged agreements, for in their brief and argument defendants designate the alleged agreements as being "indemnifying agreements or contracts." In 25 Ruling Case Law, 524, Section 109, under the title "Statute of Frauds," it is said: "In some of the early cases a contract to indemnify a person against liability which he might incur on account of an act done for or on behalf of another person is considered as within the statute. This view is based on the theory that where there is an implied liability on the part of a third person to reimburse the plaintiff, or remunerate him for the damages or loss suffered on such third person's account, the promise of the defendant to indemnify the plaintiff is an undertaking collateral to the implied liability of such third person, and so falls within the statute. . . . The better view, however, seems to be that a promise to indemnify a person against liabilities he may incur by reason of some act he may do or perform for a third person, though such third person may also by reason of such act be liable to reimburse the person to whom the promise is made, is not within the statute. *This is especially true where the effect of the performance of the act by the person to whom the promise is made is of special benefit to the person making the promise.* It does not seem to be necessary, however, that the promisor be in fact beneficially effected by the performance of the act." (Italics ours.)

The matter is stated more cautiously in 27 Corpus Juris 154, Section 39, thus: "It is frequently said that a mere promise of indemnity is not within the statute. But such statement is too broad. Although the promise is in form a promise to indemnify, if it is in fact a promise to answer for the debt of another, it is within the statute; if it is not such a promise, the statute has no application. . . . In this class of cases, the sound rule is that the promise may or may not be within the statute, dependent upon whether it is an original or collateral promise, which is to be determined by the established tests, mainly by the leading object and purpose of the promisor, the person to whom credit was given, and the existence of a consideration beneficial to the promisor."

Mr. Browne, in his standard text on the Statute of Frauds (5 Ed.) page 202, sec. 162, although not citing any judicial authority in support of his view, suggests as perhaps the most logical and satisfactory

reason for the doctrine that the statute does not, as a general rule, apply to promises of indemnity, "that the implied obligation of the third party exists only by force of, and as incidental to, the special contract between the plaintiff and the defendant. The defendant promises the plaintiff that, if he becomes liable upon the actual default of the third party, he, the defendant, will protect him; and upon the plaintiff's becoming surety accordingly, the third party, as a legal consequence thereof, becomes also bound to protect him. There was not, however, any independent obligation or debt or duty of the third party to the plaintiff, to which the defendant's promise came in aid. And it may well be said that the statute contemplates only obligations of the third party previously existing, or incurred contemporaneously with the defendant's special promise, or afterward, as the case may be, but always existing or to exist independently of any contract of guaranty between the plaintiff and defendant; an obligation which exists, or may exist, whether any contract be made between the plaintiff and defendant or not; *not an obligation which comes into existence only as a legal incident of the contract which they have made."* (Italics ours.)

Applying to the alleged agreements in the present case the established tests aforementioned—namely, the person to whom the credit was given by the plaintiff promisee; the leading and main object and purpose of the promisors in making the promises; and the existence and presence of a consideration beneficial to the promisors—we are inclined to the view that the alleged agreements, if made by defendants, constitute independent and original undertakings between plaintiff and defendants, and as such they do not fall within the letter or the purpose of the statute, and therefore they are not required to be in writing. The substance of the agreement and promise alleged in the first count of the petition is that defendants "promised and agreed with plaintiff that, if he would sign notes with them, or individually would borrow money for them for the use and benefit of the bank, and assist them in raising money to be used by said Pemiscot County Bank, they would individually hold him harmless from any loss thereby and would individually repay to him such sum or sums as he secured and furnished; . . . that said defendants promised and agreed with plaintiff that they would individually repay said money to him, *and the credit was given to the defendants,* and they agreed that they would repay same to plaintiff whenever the Pemiscot County Bank's affairs were straightened out and it was ascertained how much, if any, of the money so put up by plaintiff had not been repaid by the Pemiscot County Bank." The substance of the agreement alleged in the second count of the petition is that, after it had been ascertained that the bank was wholly insolvent and after the bank had been taken over

by the State Bank Commissioner, the defendants, in order to pay the individual depositors of the bank, or for some other reason unknown to plaintiff, sought the aid of plaintiff to raise money for the use and benefit of the bank, and "promised and agreed with plaintiff that, if he would lend his credit and secure for them $10,000 for the purpose aforesaid, they would hold him harmless and pay to him said sum, or whatever portion thereof was not paid by the Pemiscot County Bank when the affairs of the bank were finally settled up and the exact amount determined." It is specifically alleged in the first count of the petition that the credit was given by the plaintiff promisee to the defendants, but, even if there were no specific allegation to that effect, nevertheless we think the logical inference arises from the general allegations of the petition that plaintiff gave the credit to the defendants alone, and did not give credit to the bank or rely upon a primary obligation or duty of the bank to reimburse him. It is alleged in the petition that the bank was in a failing condition at the time the alleged promises were made, and that the defendants were then undertaking to save the bank from failure by borrowing money for the use and benefit of the bank, and that defendants sought the assistance and aid of plaintiff in lending his credit to defendants in that enterprise, the defendants informing plaintiff at the time that they recognized that he had been in no way connected with the operation of the bank or responsible for its operation at the time its losses occurred. The inference arises therefrom that plaintiff knew of the failing condition of the bank at the time of the making of the alleged agreements. If such be the fact, then it is unreasonable to believe that plaintiff gave any credit to the bank, in view of his knowledge of its then failing condition, or that he relied upon any primary obligation or duty of the bank to reimburse him for moneys borrowed and furnished by him for its use and benefit on the faith of defendants' promises. It is clearly evident, we think, and a logical inference arising from the allegations of the petition, that defendants, as officers, directors and stockholders of the bank, had a personal, immediate and pecuniary interest in saving the bank from insolvency and failure, and, after the bank had failed, in seeing that the depositors of the bank were paid; and, furthermore, defendants, in making the alleged promises, well may have sought thereby to escape the consequences and liability on their part for any mismanagement of the bank during their incumbency as officers and directors of the bank. Hence, it appears that defendants' main and leading object and purpose in making the alleged promises or agreements was not to answer for an implied obligation or duty of the bank to reimburse plaintiff for the moneys furnished by him pursuant to the alleged promises, but to subserve a pecuniary, business, and personal purpose of their own. If the

allegations of the petition be true, then there appears to have been abundant consideration moving from plaintiff to defendants, and beneficial to defendants as promisors, to support the promises alleged to have been made by them. [Davis v. Patrick, 141 U. S. 479, 485.] As suggested by Browne on Statute of Frauds, supra, the implied obligation or duty of the bank to reimburse plaintiff was, in any view, but a mere legal incident resulting from the contracts or agreements alleged to have been made between plaintiff and defendants; or, otherwise expressed, the implied obligation and duty of the bank to reimburse plaintiff exists only by force of, and solely as a legal consequence of, the contracts or agreements alleged to have been made between plaintiff and defendants. The evident intention and mutual understanding of the parties, as disclosed by the allegations of the petition and the situation of the parties, was that defendants were to be primarily, directly and independently liable to plaintiff for the moneys borrowed and furnished by him; not that defendants were to be secondarily liable to plaintiff, as mere guarantors or sureties, only upon the default and failure of the bank to reimburse him by reason of its implied obligation so to do. We are therefore of opinion that the alleged promises and agreements must be regarded as original and independent undertakings of defendants, and not merely collateral undertakings to answer for the debt, default, or miscarriage of the bank; hence, the alleged agreements, in our opinion, do not fall within the purview of the Statute of Frauds and are not required to be in writing.

Defendants cite and rely upon Hurt v. Ford (en banc), 142 Mo. 283, and Gansey v. Orr (Div. 2), 173 Mo. 532, in support of their contention that the alleged agreements, if made, fall within the Statute of Frauds. Both those cases (as does the instant case) involved contracts or promises of indemnity. In the Hurt case, it was alleged that Hurt had induced Ford to become a signer of a promissory note, payable to a bank, as surety for the principal maker, Hightower, who was a brother-in-law of Hurt, upon the oral promise and agreement of Hurt made to Ford that she would take up the note when due and save Ford harmless. It was ruled that, as the alleged promise of Hurt was oral, the promise was within the Statute of Frauds, and the court cited Bissig v. Britton, 59 Mo. 204, as authority for its ruling. However, there was no showing in the Hurt case, or allegation from which such fact could be reasonably inferred, that Hurt, the promisor, had any pecuniary, business or personal purpose and object to be subserved in the making of the alleged promise, or that any beneficial consideration moved from Ford, the promisee, to Hurt, the promisor, in support of the promise; which may be a point of distinction between that case and the instant case.

In the Gansey case, it was alleged that defendants were organizing a business corporation, and that they requested plaintiff to buy shares of the capital stock of the corporation, and, as an inducement for plaintiff to do so, promised and agreed that if the corporation should fail and not be able to return to its stockholders the moneys they invested in its capital stock, then defendants individually would pay plaintiff the amount of money she should pay out in the purchase of the stock; that plaintiff, relying upon the promise of defendants, purchased the stock of the corporation and paid therefor in cash; and that the corporation failed, leaving nothing to distribute to the stockholders after payment of its debts due to general creditors. Plaintiff sued defendants upon their oral agreement or promise. The decision of this court turned on the meaning to be ascribed to the word "miscarriage," as used in the statute, and it was ruled that the alleged promise "was simply an agreement to indemnify plaintiff against the miscarriage" of the business enterprise thereafter to be entered into by the corporation, and was clearly within the letter, spirit and purpose of the statute, the court saying in the opinion that it seems to be the rule in this State "that where one person invests money at the solicitation of another and upon the promise of the latter to indemnify him against the consequences, no action will lie upon such promise unless it be in writing, under the Statute of Frauds," citing Green v. Cresswell (Eng.), 10 Ad. and El. 453; Bissig v. Britton, 59 Mo. 204; and Hurt v. Ford, 142 Mo. 283, in support of the holding. Bissig v. Britton, 59 Mo. 204, was an action brought upon a verbal promise made by defendant to hold plaintiff harmless from damages by reason of plaintiff signing, as co-surety with defendant, a replevin bond for a third person, as principal in the bond. It was held in that case that the verbal promise of indemnity came within the provisions of the Statute of Frauds and was incapable of enforcement because not made in writing. The court based its holding upon the English case of Green v. Cresswell, 10 Ad. and El. 453, which was said to have overruled the earlier English case of Thomas v. Cook, 8 Barn. and Cr. 728, and upon certain decisions of the courts of other states following the case of Green v. Cresswell. Bissig v. Britton, supra, has been criticised and partially overruled, at least, by Division One of this court in Quackenboss v. Harbaugh, 298 Mo. 240, 253. The English case of Green v. Cresswell, 10 Ad. and El. 453 (which is the foundation of the decisions of this court made in Bissig v. Britton; Hurt v. Ford; and Gansey v. Orr, supra), appears to have been overruled by the later English cases, and the doctrine announced by Thomas v. Cook, 8 Barn. and Cr. 728, reaffirmed. [25 R. C. L. 526, sec. 110; Browne on Statute of Frauds (5 Ed.) sec. 161b.] The result has been that the preponderance of later American decisions has rejected the doctrine of Green v. Cresswell and ac-

cepted the doctrine of Thomas v. Cook. [Browne on Statute of Frauds (5 Ed.) sec. 162.] In Thomas v. Cook, supra, plaintiff, on defendant's request and oral promise to indemnify him, joined defendant as surety on the bond of a third party to secure his debt to a fourth party. There was therefore no primary obligation of the third party to plaintiff, except the obligation arising by implication of law if plaintiff should be required to respond as surety of the third party on his bond. BAYLEY, J., said, in ruling that plaintiff could recover on defendant's oral promise of indemnity: "A promise to indemnify does not, as it appears to me, fall within either the words or the policy of the Statute of Frauds." And PARKE, J., said in the same case: "This was not a promise to answer for the debt, default, or miscarriage of another person, but an original contract between these parties, that the plaintiff should be indemnified against the bond. If the plaintiff, at the request of the defendant, had paid money to a third person, a promise to repay it need not have been in writing, and this case is in substance the same." In a later case, Guild & Co. v. Conrad (1894), 2 Q. B. 885, 896, wherein Thomas v. Cook was held to have been rightly decided, DAVEY, L. J., in holding that promises to indemnify are not within the Statute of Frauds, remarked: "In my opinion, there is a plain distinction between a promise to pay the creditor if the principal debtor makes default in payment, and a promise to keep a person who has entered, or is about to enter, into a contract of liability indemnified against that liability independently of the question whether a third person makes default or not." The later English decisions, which adhere to the doctrine announced in Thomas v. Cook and reject the doctrine announced in Green v. Cresswell, seem to hold that no promise or contract of indemnity falls within the Statute of Frauds. [See, Wildes v. Dudlow, Law Rep. 19 Eq. 198; Guild & Co. v. Conrad (1894), 2 Q. B. 885; Harburg, etc., Co. v. Martin (1902), 1 K. B. 778.] The Missouri decisions above cited, on the other hand, seem to hold that every and all contracts or promises of indemnity fall within the Statute of Frauds. The better and sound rule, we think, is that a promise of indemnity may or may not fall within the statute, depending on whether the promise is an original and independent undertaking, or whether it is a collateral undertaking; if the former, it does not fall within the statute; if the latter, it does. Whether the promise of indemnity is an original undertaking, or whether it is a collateral undertaking, is to be determined from the intention of the parties at the time the promise is made, as disclosed by the language or expressions used, the situation of the parties, and the circumstances surrounding the transaction, aided by the application of the accepted tests or rules above stated. [Davis v. Patrick, 141 U. S. 479; Johnson v. Bank, 60 W. Va. 320; Harris v. Frank, 81 Cal.

78

280; Atlas Lumber and Coal Co. v. Flint, 20 S. D. 118; Elder v. Warfield, 7 Harr. and J. (Md.) 397.]

Therefore, we are of opinion that our prior holdings in Bissig v. Britton, Hurt v. Ford, and Gansey v. Orr, supra, should no longer be followed insofar as they may be authority for a rule or doctrine in this State that every and all promises or contracts of indemnity fall within the Statute of Frauds and must therefore be in writing, regardless of whether such promises be original and independent undertakings between promisor and promisee, or whether they be merely collateral undertakings.

It is further urged by defendants that the allegations of the petition disclose that the moneys borrowed and furnished by plaintiff were deposited to plaintiff's account and personal credit in the Pemiscot County Bank, and that therefore the relation of debtor and creditor existed between plaintiff and the bank, within the rule announced in Utley v. Hill, 155 Mo. 232, 259, and makes the bank the original and primary debtor of plaintiff. We do not think that the allegations of the petition will bear such interpretation and construction. The allegations of the first count of the petition are to the effect that the moneys furnished by plaintiff in reliance upon the alleged promises of defendants were "turned over as directed by defendants for the use and benefit of said Pemiscot County Bank," and the allegations of the second count of the petition are to the effect that the promise of defendants was made, and the money was furnished by plaintiff pursuant thereto, after the bank had closed and had been taken over by the bank commissioner. We think that it cannot be well said from such allegations that plaintiff intended that the relation of bank and depositor, or debtor and creditor, should apply to the moneys furnished by him under the alleged promises of defendants.

The several contentions of defendants in support of the directed verdict and judgment thereon must be ruled against them.

IV. Having ruled against the contentions of defendants that the directed verdict and judgment thereon are right, regardless of the  errors, if any, of the trial court, we pass to the consideration of the errors assigned by plaintiff. Arthur L. Oliver, an attorney, was offered as a witness by plaintiff, and after being asked certain preliminary questions, defendants' counsel asked leave of the court to interrogate the witness for the purpose of laying the foundation for an objection to his competency. Thereupon, defendants' counsel was permitted to ask the witness if his knowledge of every fact concerning which he would testify was acquired while defendants were his clients. Witness answered, "Well, I don't know exactly what I am going to be asked about, but all I know, so far as it might be pertinent, was derived

while that relation existed." He was then asked, "And you got no fact that is pertinent to this lawsuit or any issue in the lawsuit, except such as you may have acquired from time to time while you were the attorney for the parties to this suit, both plaintiff and defendants, is that true?" Witness answered, "I would say I derived no facts other than in the relation of attorney and client." Witness was then asked whether he had heard a conversation between defendants and plaintiff "in reference to Wahl (plaintiff) borrowing money or lending his credit in securing money for the Pemiscot County Bank," and if that knowledge came to witness by reason of his relation as attorney for defendants. Witness answered, "Yes. I considered myself attorney for both Cunninghams (defendants), the bank and Mr. Wahl (plaintiff) at the time. Q. Any information touching the question came to you through your relation as attorney for these parties? A. I would say all the information I had was conversations had in my presence by them while I was acting as attorney for them in my office. Q. Were you employed by either Wahl, John Cunningham or Frank Cunningham in regard to any matters between them as to what agreement they should make between themselves in raising this money? A. No, sir, I wasn't employed by either of them as to their respective rights; all I know was, while representing them in this bank trouble, this matter came up." Defendants' counsel objected to any testimony by the witness because of his incompetency by reason of the relation of attorney and client. Thereupon plaintiff offered to prove by the witness that, in May, 1913, witness was present with plaintiff and defendants in witness's office, and that witness "heard F. J. Cunningham and J. A. Cunningham (defendants) and S. P. Reynolds, each of them, say to Mr. Wahl (plaintiff) that they recognized he was a new director and had nothing to do with the operation of this bank, but that they individually needed his assistance to get this money, and that if he would lend his credit and would help them borrow the money, that they—each of them—would personally hold him harmless from any loss therefor." Upon objection of defendants' counsel, the offer of proof was denied by the trial court.

In 40 Cyc. 2377, it is said: "There is no privilege as to a communication between attorney and client in the presence of a third person, or of the adverse party or his attorney, and either the attorney or the third person who was present may testify in respect thereto." Where it appears that a conversation or transaction was not private, but was had in the presence of an attorney and all parties concerned, the disclosures are not privileged and do not constitute a professional and confidential communication between attorney and client. [Deuser v. Walkup, 43 Mo. App. 625; Deuser v. Hamilton, 52 Mo. App. 394; State v. Cummings, 189 Mo. 626, 642.]

We think that the witness, Oliver, was competent to testify respecting conversations had, and agreements made, between plaintiff and defendants in his presence. "Where two or more persons employ the same attorney in the same business, their communications with the attorney in relation to such business are not privileged *inter sese*, even though the interests of such persons are adverse to each other, where the disclosures were made in the presence and hearing of all concerned or were intended for the information of all." [40 Cyc. 2368.] In our opinion, the trial court erred in sustaining defendants' general objection to the competency of the witness and in refusing to permit him to testify respecting conversations and transactions had in the presence of the witness, plaintiff and the two original defendants.

V. The trial court, upon the objection of defendants, refused to allow the plaintiff to testify as a witness in his own behalf. The ground of defendants' objection was that one of the original defendants, John A. Cunningham, had died since the commencement of the suit and the cause had been revived in the names of the administrators of his estate, as substituted defendants, and by reason thereof plaintiff was precluded from testifying as a witness in his own behalf respecting any fact in issue. It is alleged in plaintiff's petition that the original defendants, John A. Cunningham and F. J. Cunningham, were co-contractors with plaintiff, and such is evidently the theory upon which the suit was brought, for John A. Cunningham and F. J. Cunningham were joined as co-defendants. No objection is shown to have been made by defendants, or either of them, upon the ground of misjoinder of parties defendant. It appears from the record herein that, while one of the alleged co-contractors, John A. Cunningham, is dead, the other alleged co-contractor, F. J. Cunningham, is alive. Such being the alleged facts, plaintiff was competent as a witness in his own favor and behalf.

In Fulkerson v. Thornton, 68 Mo. 468, we said: "Objection was made to plaintiff testifying on the ground that as William T. Thornton, Sr., one of the alleged contracting parties, was dead, plaintiff was an incompetent witness. This objection was, we think, properly overruled. Thornton, the deceased, was not the sole contracting party; that party was composed of Thornton and Hitch, the latter being alive at the time of trial. The legal party to the contract did not consist of a single individual, but of two persons—Thornton and Hitch. If the contract had been made with Thornton alone, and he was dead at the time of trial, a widely different question would be presented. . . . The reason of the statutory prohibition is the prevention of one person testifying where death has sealed the lips of

his adversary; a reason which cannot possibly apply where there are other persons, still alive, who were co-contractors with the decedent, cognizant of all the facts as well as he was, able, therefore, to testify in opposition to the testimony of the witness objected to as being incompetent because of the death of one of the co-contractors. As the reason for the rule does not exist, no more does the rule.'' Again, in Williams v. Perkins, 83 Mo. 379, 385, it is said: ''The exclusion of defendant, Perkins, from the witness stand cannot be supported by the decisions of this court. The fact that one of the adverse parties to the contract or cause of action sued on is dead, does not, of itself, disqualify the opposing party as a witness, provided a surviving adverse party remains, as in this case. [Fulkerson v. Thornton, 68 Mo. 468; Amonett v. Montague, 75 Mo. 43; Nugent v. Curran, 77 Mo. 323.]''

While the statute (Sec. 5410, R. S. 1919) provides that, if one of the original parties to a contract or cause of action in issue and on trial is dead, the opposite party to such contract or cause of action shall not be admitted to testify in his own favor, yet the statute further provides that ''where an executor or administrator is a party, the other party shall not be admitted to testify in his own favor, *unless the contract in issue was originally made with a person who is living and competent to testify.''* (Italics ours.) The statute therefore, by its very language, seems to contemplate that, if there are two or more co-contractors on one side of a contract, and one of them is dead at the time of trial but the other co-contractor or co-contractors are living and competent to testify, the opposite party to the contract may testify in his own favor and behalf in an action wherein the executor or administrator of the deceased contractor is a party. Such was the situation in McConnon & Co. v. Kuhlmann (K. C. Ct. App.), 278 S. W. 822, 824, where the action was prosecuted solely against the administrators of the estate of a deceased contractor. In that case, the court said: ''It is insisted 'that the two McConnons, who are and were both officers and stockholders in plaintiff company, were incompetent to testify to matters set forth in their depositions, H. C. Kuhlmann, the surety and only defendant in this case, being dead.' The facts show in regard to this matter that Calhoun, the other party with Kuhlmann to the contract, is alive and lives in Jefferson City. As Calhoun was a co-contractor with Kuhlmann, and as the former is alive and can testify, the testimony of the McConnons was competent. [Fulkerson v. Thornton, 68 Mo. 468; Vandergriff v. Swinney, 158 Mo. App. 527; Birdsall v. Coon, 157 Mo. App. 439, 448; Brunk v. Ry. Co., 198 Mo. App. 243; Bank Co. v. Loomis, 140 Mo. App. 62.]''

We think that plaintiff was competent as a witness to testify in his own favor and behalf in the instant case, and that the learned

trial court erred in refusing to allow him to testify. While no formal offer was made showing what testimony the witness would have given if he had been permitted to testify, we do not think that the omission of a formal offer of proof precludes plaintiff from raising the question of error on appeal. In this case, the witness who was not permitted by the court to testify was the plaintiff in the action. It will be presumed that, if he had been allowed to testify, his testimony would have tended to prove the allegations of his petition and establish the amount of his damage. Where it is clearly evident, as it is here, what the testimony of the witness probably will be if he is allowed to testify, no formal offer of proof is necessary, and the question of his rejection as a witness is open for review on appeal. [3 C. J. 827; Ahlfeldt v. City of Mexico, 129 Mo. App. 193, 200.] The exclusion of plaintiff as a witness in his behalf prevented him from making his case and establishing the allegations of his petition and the amount of his damage. The action of the trial court in excluding plaintiff as a witness constitutes reversible error.

Because of the aforementioned errors, the judgment *nisi* must be reversed and the cause remanded for trial. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—This case coming into Court en Banc, the foregoing opinion of SEDDON, C., delivered in Division One, is adopted as the opinion of the court. All of the judges concur.