**TENNA MANUFACTURING COMPANY, INC., Plaintiff,**

v.

**COLUMBIA UNION NATIONAL BANK AND TRUST COMPANY, Defendant.**

No. 75CV–729–W–2–6.

United States District Court, W. D. Missouri, W. D.

Feb. 14, 1980.

Irving Achtenberg, Achtenberg & Achtenberg, Kansas City, Mo., for plaintiff.

Harlan D. Burkhead, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for defendant.

## OPINION AND ORDER DIRECTING ENTRY OF JUDGMENT

SACHS, District Judge.

This diversity suit, brought by an Ohio seller of goods against a Missouri bank for alleged misrepresentations inducing a sale of goods to a defaulting buyer, arises from a five or ten minute telephone call on January 6, 1975. The credit manager of the seller ("Tenna") spoke to an employee of the bank ("Columbia Union") and was given reassuring information concerning the prospective buyer's average bank balance, loan payment record, net worth and customers. Tenna contends it was seriously misled by misrepresentations, half-truths and nondisclosures, that it thereupon sold some $17,000 worth of small motors to the buyer ("Honan") and suffered losses when, within about two months, Columbia Union called its secured loan to Honan and seized all of Honan's assets, including the motors, leaving nothing for Tenna, an unsecured creditor.

Tenna initially sued the corporate buyer and its major stockholders as well as the bank, but settled with the co-defendants upon payment of $4,000. The remaining claim against Columbia Union is in the amount of $13,983.36, with interest.

After withdrawal of a jury demand, the case was tried to the Court on January 28, 1980, with most of the evidence being in the form of documentary evidence and the depositions of witnesses who are no longer available to testify. The Court also heard testimony from an official of the Small Business Administration ("SBA"), guarantor of Honan's bank loan, from Honan's principal officer and stockholder, and from an official of Columbia Union who was not directly involved in the Honan loan or in dealings with Tenna. All witnesses were called by Tenna. Columbia Union's position is that there was an insufficiency of proof to allow recovery, and, moreover, the Missouri Statute of Frauds prevents reliance on the telephone conversation with its employee, Gaston. Sec. 432.040, RSMo.[1]

Tenna contends that Columbia Union cannot rely on the Missouri statute when giving oral credit information to a nonresident whose losses will be suffered elsewhere, that the statute does not deal with misleading nondisclosures, and that the statute does not immunize conversations with a party which has a financial interest in the transaction and ultimately gains therefrom.

The Court's conclusions, detailed below, generally accept Columbia Union's legal position, although the Court finds enough misleading information in the conversation to impose liability on Columbia Union under Missouri law for its modest gains from the transaction which resulted from the conversation.

## FINDINGS OF FACT

The following facts are material to the Court's ruling or are helpful to a general understanding of the case:

1. Plaintiff Tenna is an Ohio corporation with its principal place of business in that State; defendant Columbia Union is a bank organized under Federal law with its principal place of business in Kansas City, Missouri. Pretrial Stipulation, ("Stip.") filed August 8, 1977, paras. 1 and 7.

2. On December 19, 1974, Honan directed a purchase order to Tenna for 10,000 motors at $3.20 per motor, credit being approved on such purchase order on January 6, 1975. P.Exh. 15. The terms of release were 1,000 at once, with balance at 2,500 per month, beginning February 15, 1975. P.Exh. 15, Stip. para. 11. Payment terms were net 30 days. P.Exh. 15.

3. By subsequent arrangement, 100 motors were shipped and invoiced on January 14, 1975 and 5,265 motors were shipped and invoiced on January 16, 1975. The total agreed price (never paid) was $17,983.36. Stip. paras. 12–14.

4. Credit approval was given by Tenna's credit manager, Maurice Chodorow (identified on the purchase order as M.C.), in reliance on a telephone conversation of January 6, 1975, with Stephen F. Gaston, an assistant cashier of Columbia Union, who was assigned to the bank's secured lending department as credit administrator. P.Exh. 15, Gaston Dep. 4, Stip. paras. 16, 22, Chodorow Dep. 19–20, 34, 45–6. Chodorow's call, from Ohio, was directed to Gaston by the bank's telephone switchboard operator.

5. Gaston was thoroughly familiar with the Honan account, being responsible for the administration of loan documents and examining the status of the loan. Gaston Dep. 5, 8; Allison testimony; P.Exh. 20. Gaston and his superior, Haines, reported on the status of the Honan account at periodic departmental meetings. Allison testimony.

6. When Chodorow spoke to Gaston, he probably followed normal practice in explaining that Tenna was considering a sale of motors priced at some $40,000 and that the bank had been given as a credit refer-

---

1. "No action shall be brought to charge any person upon or by reason of any *representation or assurance* made concerning the character, conduct, *credit*, ability, *trade or dealings* of any other person, unless such representation or assurance be made in writing, and subscribed by the party to be charged thereby, or by some person thereunto by him lawfully authorized." The statute is closely related to the requirement of a written promise "to answer for the debt . . . of another person . . . ." Sec. 432.010, RSMo.

ence. There is no evidence, however, that the potential buyer, as the bank's customer, had authorized Gaston to supply all details of its business (Gaston Dep. 36), and such lack of authorization would have made Gaston somewhat reticent in making disclosures. Allison testimony; Gaston Dep. 37. As credit manager, Chodorow probably was aware that Gaston was inhibited in volunteering disclosures which might be adverse to Tenna.

7. Gaston supplied to Chodorow the following information about Honan:

(a) Honan's bank balance was in the "low five figures" ($10,000 to $20,000). Chodorow Dep. 24.

(b) Honan was current on its loan obligations to the bank, and there were "no situations of defaults or anything of this nature." Chodorow Dep. 25; Gaston Dep. 38.

(c) Honan's net worth was in the "high five figures" ($75–95,000). Chodorow Dep. 25.

(d) Honan had an inventory of $40–45,000. Chodorow Dep. 25.

(e) Honan had Montgomery Ward and Western Auto as customers. Chodorow Dep. 25–6. This information was particularly significant to Tenna, in that Chodorow considered these purported customers as excellent accounts, paying well and "moving a lot of merchandise." Ibid.

(f) Honan had experienced "some minor problems . . . because it was a young business" but Gaston "did not see any reason why (Tenna) could not reasonably expect payment . . ." Gaston Dep. 38. Although Chodorow did not remember these comments on his subsequent deposition, and had not made a notation concerning them (presumably because they were generalizations), the Court accepts Gaston's recollection as a credible admission, and considers that the belittling of Honan's "problems" was likely persuasive.

8. The bank balance on Honan's commercial account on January 6, 1975, was $443.03, and said account was rarely at "five figures." P.Exh. 24. Honan's "custodian account," however had a balance of $18,309.22 on January 6, 1975. D.Exh. 1. The custodian account was used in collecting accounts receivable. Allison testimony. The bank account information given by Gaston was not substantially erroneous, although Gaston did not advise Chodorow (and was not asked) how closely controlled Honan was on its secured loan.

9. In March, 1975, Columbia Union decided to call its loan, stating reasons for insecurity which did not include failures of Honan to make payments when due. P.Exh. 14. Gaston's statement to Chodorow that Honan was not in default on its loan payments was accurate, according to the record, although somewhat misleading in that the lenders (Columbia Union and its guarantor, SBA) had previously deferred certain payment requirements. Stip. para. 19.

10. The bank's most recent financial statement from Honan, as of the time of the telephone conversation with Chodorow, was a November, 1974 statement showing "a positive net worth of $55,000", but Gaston was doubtful (when deposed) that it took into account a $75,000 loss for the year 1974, which was recorded on a profit and loss statement dated a month later. Gaston Dep. 32–3. In November, 1974, Columbia Union had been advised, in a letter from SBA, that Honan's "financial statements show a net investment of only $73,509 after reflecting losses sustained in *prior* years (which) compare unfavorably with (Honan's) indebtedness totaling $383,978." P.Exh. 9 (emphasis supplied). Columbia Union subsequently determined, at least by March, 1975, that Honan had a slightly *negative* net worth as of January, 1975. P.Exh. 14. Gaston's statement was thus materially incorrect, although the statement seems to have been based on the most recent figures available to Gaston.

11. Honan's inventory as of December 31, 1974, was $53,328.21. Gaston Dep. 23. As of October 17, 1974, Honan's president reported to the bank, however, that "our inventory is approximately $18,000 which is going to make it impossible for us to meet any projected (sales) figures as provided

you at these inventory levels, and, frankly, we need your help" to obtain a $400,000 loan for adequate capitalization.[2] Honan stated in a report to the bank on December 2, 1974, that the company required an average inventory of $142,000. P.Exh. 20. Gaston's advice to Chodorow as to Honan's inventory was thus apparently accurate when given, although it skirted very serious business problems.

12. There is no evidence that Honan could fairly be considered a supplier of Montgomery Ward and Western Auto, as represented by Gaston. In advice to Columbia Union in July, 1974, Honan's president had stated that "in addition to . . . purchase orders, we have on hand commitments from Sears, Ward's, Penney's and Western Auto Supply Company for national programs." P.Exh. 17. Because of inventory inadequacies and undercapitalization, of which Gaston was or should have been aware, these major companies were no more than prospects. P.Exh. 20. It was seriously misleading for Gaston to induce Chodorow to believe Honan had a going business with the named concerns.

13. Honan was suffering from more than "minor" problems, as of January, 1975, and was in fact in a precarious condition. Honan "ran out of money" in September, 1974, and had not found a new source of funds. P.Exh. 20. Gaston's assurances were materially misleading.

14. On or about March 15, 1975, Columbia Union declared a default on one or more of its loans to Honan, and thereafter took possession of substantially all the assets of Honan, including the merchandise shipped by Tenna. Stip. para. 24.

15. On April 15, 1975, Tenna made demand on Honan for payment of its obligation to Tenna. Stip. para. 15.

16. SBA was the guarantor, to the extent of 80%, of Honan's obligations to the bank on its major bank loan in the authorized amount of $400,000. Columbia Union called upon SBA for payment under the guaranty, and SBA made such payment and took over servicing of the account in August, 1975. Rasmussen testimony.

17. The motors acquired from Tenna were sold, on behalf of SBA, by Honan's former president. He sold 500 motors for $3.00 each and the balance for $2.75. A 10% sales commission was charged. Honan testimony.

18. On August 30, 1976, receipts from the sale of assets were paid to Columbia Union, based on the bank's 20% security interest in the assets. Allison testimony.

19. Columbia Union's share of the proceeds from the sale of Tenna's motors was 20% of the net proceeds ($13,390.87) or $2,678.17.[3]

## CONCLUSIONS OF LAW

### I.

The Court agrees with Columbia Union that Missouri law, with its pertinent Statute of Frauds provision (Sec. 432.040, RSMo), governs this transaction, where an Ohio seller telephoned to a Missouri bank for credit information.

In considering choice of law with respect to the Statute of Frauds, the Missouri Supreme Court has relied on the theory that the Missouri statute "has been considered a rule of evidence affecting the remedy," and has thus applied forum law in litigation brought in Missouri. *Campbell v. Sheraton Corp. of America*, 363 Mo. 688, 253 S.W.2d 106, 109 (1952). In the alternative, the Missouri Court looked to forum law because Missouri was deemed to have the greatest interest in the transaction. *Ibid.*, 110.

A comparison of governmental interests is a method increasingly favored to resolve conflicts. *Strassberg v. New England Mutual Life Insurance Company*, 575 F.2d 1262 (9th Cir. 1978). This technique has recently been emphasized in Missouri cases. *Nation-*

---

**2.** On November 25, 1974, SBA refused to guaranty the requested loan (Stip. para. 25), and Honan's future was bleak when Chodorow spoke to Gaston. P.Exh. 20.

**3.** 500 motors at $3.00 sold for $1,500. The remaining 4,865 motors at $2.75 sold for $13,-378.75. Sales commission on $14,878.75 was $1,487.88.

al Starch and Chemical Corp. v. Newman, 577 S.W.2d 99, 104 (Mo.App.1978).

When the Court in Campbell relied on a "procedural classification," it implicitly considered the statutory objective of protecting the courts and alleged promisors by "limiting the possibilities of perjury" and "avoiding unseemly disputes" as to what sort of assurances or promises may have been made. 1 Restatement of Conflict of Laws 2d, § 141, page 392.

Another objective of the pertinent Statute of Frauds is to protect a speaker from being bound by ill-considered promises or assurances, and, in the current context, from being drawn, without consideration, into other parties' transactions. 3 Williston on Contracts (3d ed.) § 452. A requirement of a writing helps "to insure a sufficient seriousness of intent." Lee v. Jenkins Brothers, 268 F.2d 357, 372 (2d Cir. 1959).

All of these factors direct the Court to look to Missouri law, in that the protective features of the statute should be made available to a Missouri court and a Missouri-based defendant. The fact that the recipient of the alleged assurances or promises may be a nonresident, and its reliance may occur in another state, would not generally call for exempting the transaction from the full force of Missouri law.

The State of Ohio, which has no similar statute, would seem to have slight interest in applying extraterritorially its local common law of fraud and misrepresentation. While the protection of Ohio residents from fraud is surely a significant objective of local Ohio law, it would be anticipated that Ohio would rely on Federal law and out-of-state law for the protection of Ohio residents who engage in out-of-state transactions.

Further supporting a choice of Missouri law is the fact that an Ohio party contacted a Missouri party by telephone, thus using the telephone as a substitute for coming to Missouri to seek out credit information. Under such circumstances, the parties "could reasonably expect Missouri law to apply." Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1268 (8th Cir. 1975).

The Court therefore accepts Missouri law as controlling in this diversity case.

## II.

As previously quoted in footnote 1, the sweeping provisions of Sec. 432.040, RSMo, clearly apply to all representations and assurances on which Tenna relies. If Tenna is unable to rely on what Gaston said, it doubtless could not rely on what he failed to say. Moreover, the Court is unable to find any reliance in fact, or any reasonable reliance, on Gaston's failure to disclose information about which Chodorow did not ask; for example, the security arrangements which extended to all of Honan's assets, existing and after-acquired.

On the other hand, some of the representations implicitly dealt with matters not directly mentioned. If, as Gaston concedes, he told Chodorow that Honan had been suffering from only "minor" problems, such a representation is inconsistent with Honan's being so seriously undercapitalized as to be considered "out of money" for a period of months prior to the inquiry, and having insufficient inventory to service prospective customers. P.Exh. 20.

■ The Court believes that all representations and assurances causing the extension of credit to Honan were required to be in writing, under the statute, before Tenna could safely rely on them. Missouri law generally gives total immunity to irresponsible speech in oral responses to credit inquiries. Boyd v. Farmers' Bank, 223 Mo. App. 442, 14 S.W.2d 6 (1928).

■ By interpretation and application, however, the statute may not be used when the response is principally motivated by direct self-interest and is intended to create a contract to which the respondent would be a party. Boyd, supra. Nor does the statute apply to avoid liability as a "trustee ex maleficio" to the extent of any unjust enrichment. Beall v. Farmers' Exchange Bank of Gallatin, 76 S.W.2d 1098, 1100–1 (Mo.1934).

The *Boyd* opinion rejects a contention that the statute is no defense to a claim for fraud and deceit, even when it is claimed that "the main purpose and object of the representations . . . were to subserve a pecuniary purpose of the bank." 14 S.W.2d at 8. It was said to be " 'immaterial that the person making the representations may have had some design of obtaining an incidental advantage to himself as a result of the credit intended to be secured thereby.' " Ibid.[4] The *Boyd* court conceded, however, that "when the primary purpose of such representations (was) to secure the execution of a contract to which the person making them is a party, such representations are not within the terms of the statute and need not be in writing in order to be actionable." Ibid.[5]

*Boyd* almost precludes Tenna from making any claim, as Tenna does not and cannot contend that Columbia Union sought the execution of a contract to which the bank itself would be a party.

*Beall* lends some support to Tenna, however, to the extent that Tenna limits itself to following assets which were ultimately acquired by Columbia Union as the result of the misleading information supplied orally by Gaston. The facts in *Beall* were considerably more favorable to the plaintiffs, however, in that the bank's cashier was plainly guilty of fraud in selling a note on oral representations as to the financial responsibility of the makers; he also supplied a spurious financial statement in his own handwriting. While ruling that the oral statements alone would not support a claim, the Missouri Supreme Court held the defendant bank liable as "trustee ex maleficio" of assets which it acquired by reason of the cashier's fraud. The Court relied on the fact that the bank's assets were "swelled by the transactions." 76 S.W.2d at 1101.

More recent Missouri cases impose constructive trusts to prevent unjust enrichment occurring through constructive fraud as well as actual fraud. *Steele v. Cross*, 366 S.W.2d 434 (Mo.1963); *Murphy v. Olds*, 508 S.W.2d 249 (Mo.App.1974). Even an innocent misrepresentation may give rise to a constructive trust. *Basman v. Frank*, 250 S.W.2d 989, 993 (Mo.1952) (referring to misrepresentation as a separate ground for imposing a trust, in addition to such alternate grounds as fraud or breach of duty under a confidential relationship). See also *In re Mid-Center Redevelopment Corp.*, 383 F.Supp. 954, 972 (D.N.J.1974).

In the present case the Court has found material misrepresentations of fact causing an extension of credit to Honan, which permitted Honan to acquire assets from Tenna, a portion of which ultimately enriched the bank. Ruling as it believes a Missouri court would, in this unchartered segment of Missouri law, the Court concludes that unjust enrichment has occurred, and that Columbia Union should be treated as a constructive trustee of the sum of $2,678.17, which it finally acquired as a result of the misrepresentations.[6]

It is therefore ORDERED that judgment be entered in favor of plaintiff and against Columbia Union National Bank, in the amount of $2,678.17, together with interest at the rate of 6% from August 30, 1976.

---

4. Missouri reportedly shares with Maine and Massachusetts an exceptionally rigid rule applying the statute even though a defendant has made a fraudulent statement. *Brock & Davis Co., Inc. v. Charleston National Bank*, 443 F.Supp. 1175, 1179 (S.D.W.Va.1977).

5. Compare *Wahl v. Cunningham*, 320 Mo. 57, 6 S.W.2d 576, 580–5 (1928), distinguishing between "collateral" and "original" guaranties of debts of third persons.

6. In post-trial suggestions, Tenna contends that the Court should not restrict it to recovery of sums actually received by Columbia Union, but should impose liability as in a conversion case, because the bank was at one time in possession of the motors. The Court does not believe the evidence shows that Columbia Union dealt with the motors in an arbitrary or self-serving manner; rather, it seems to have acted reasonably and in accordance with its contractual relationship with SBA. Tenna has previously asserted that Columbia Union "would be unjustly enriched if allowed to retain proceeds from liquidation of (Tenna's) merchandise, so constructive trust should be imposed on the proceeds." To the extent Columbia Union received such proceeds, the Court agrees.

Costs will be assessed in favor of plaintiff and against the defendant bank.