ALFRED W. FEILER *v.* BENJAMIN
ROSENBLOOM ET AL.

[No. 1380, September Term, 1979.]

*Decided July 14, 1980.*

298

The cause was argued before Gilbert, C. J., and Couch and Weant, JJ.

*Bernard W. Rubenstein,* with whom were *Edelman & Rubenstein, P.A.* on the brief, for appellant.

*Stuart M. Salsbury,* with whom were *Max R. Israelson* and *Israelson & Jackson, P.A.* on the brief, for appellees.

Gilbert, C. J., delivered the opinion of the Court.

Two divergent schools of thought are involved in this appeal. The appellant, Alfred W. Feiler, urges that we follow that expressed by the late Samuel Goldwyn that "[a] verbal contract isn't worth the paper it's written on." [1] The appellees, Benjamin Rosenbloom, Adolph Farber, William Chanoff and Charles Ellerin, suggest we adhere to that stated in *Don Quixote* [2] "an honest man's word is as good as his bond." Indeed, the appellees actually go one step beyond *Don Quixote* and entreat that "a man's word be made to be as good as his bond." Being men of conviction, the appellees invoked the jurisdiction of the Superior Court of Baltimore City (Sklar, J.) to assure that the appellant's word was not only his bond, but a "negotiable bond."

After a non-jury trial, a judgment was entered against the appellant for $41,666.67 plus interest. This appeal is an out-growth of that judgment.

*—THE FACTS—*

The facts from which this litigation arose were fully and

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, October 24, 1980.

1. L. Peter, *Peter's Quotations — Ideas for Our Time* 287 (1977).
2. Miguel De Cervantes, *Don Quixote de la Mancha,* Part IV, ch. 34.

accurately set out by the trial judge. We, with very minor editing, quote therefrom:

"In the latter part of 1972, the ... [appellant and the appellees] were members of the Board of Directors of ... [Togs, Inc. (Togs)], a Maryland Corporation, which was concerned in marketing a new concept in the manufacturing of buttons. At that time, the corporation needed additional financing to sustain itself in further business endeavors, including the marketing of buttons.

On December 18, 1972, ... [a] Bank made a $250,000 loan to ... [Togs] as principal obligor, that loan being due for payment on June 18, 1973. To assure itself of repayment, the [B]ank required certain members of the ... [Togs] Board of Directors to sign the loan note as guarantors.

Testimony at trial [of this case] was that at a meeting of the Board of Directors on December 19, 1972, the note was presented to the parties/directors for their signatures as guarantors. ... [Appellant] objected to his being required to guarantee the loan because of other pending personal financial negotiations which the new bank guarantee might adversely affect.

According to ... Rosenbloom's testimony, [he, Feiler,] Farber and Kahn left the meeting room to discuss the matter.... Mr. Kahn returned to the meeting ... [but appellant,] Rosenbloom and Farber continued discussing the matter.

Messrs. Rosenbloom and Farber testified that an agreement was reached whereby ... [Feiler] was not required to sign as a guarantor, but [he] would still accept his responsibility for a pro rata one-sixth share of the loan payable to the five signatory guarantors who would be required to pay in the event of default by the corporation.

... Mr. Rosenbloom ... signed the note as a guarantor on the day it was issued. ... Chanoff,

Farber and Ellerin testified that they agreed to sign the note as guarantors only because of . . . [Feiler's] promise to be responsible for his pro rata share . . . [even though he did not sign as a guarantor]. Another director, Mr. Edward Kahn, who also signed the note was subsequently released as a guarantor because of bankruptcy.

In a letter to . . . Farber dated December 20, 1972, . . . the day after the Board Meeting, the . . . [appellant] confirmed his separate agreement to pay one-sixth of the note . . . [even though he did not sign] it, but [he] included in that letter a statement 'my share of the financial responsibility would automatically be considered as void if for any reason there might be a change in the Executive Committee as established in yesterday's meeting of the Board of Directors.'

. . . [Feiler, however,] admitted in a deposition prior to trial that his oral agreement at the Board Meeting had been unqualified. . . . [Appellant's] deposition reads as follows:

'Q  Now, are you saying you did or did not accept a one-sixth share obligation under the statute?

A  With qualifications.

Q  Now the qualification was what again, please?

A  In substance as long as I am in charge of running of the company by an Executive Committee.

Q  And did you say that to them on the previous day when you were speaking with them in person?

A  I have to answer at length. I said . .

Q  No, no, first of all, before you answer at length —

A  Yes.

Q — answer yes or no whether you said to them on the previous day the substance of your last answer?

A No.'

. . . .

. . . Feiler's answer at the deposition clearly indicates that at the time he orally promised the . . . [appellees] to be partially responsible for the loan guarantee, which promise induced the . . . [appellees] to become guarantors, no condition or qualification of liability was mentioned.

Testimony at trial of Mr. Flagg, Vice-President for Commercial Banking at . . . [the] Bank, revealed that on June 18, 1973, the $250,000 six-month loan note of December 18, 1972, was renewed, but at an increased interest rate of 8½%. In addition, the character of the note was testified to as having changed from a time instrument to a demand one. The bank records revealed that the loan note was further renewed at other times and at various rates of interest.

. . . [Togs] failed to evolve into a profitable business operation. Ultimately, it failed to meet its financial obligations and the guarantors of the $250,000 note were called upon to pay off the loan and accrued interest. Testimony of Mr. Flagg was that the records of the bank show that the note and interest were paid in full by the . . . [appellees] in this action.

. . . [Feiler] resigned from . . . [Togs] on October 9, 1973. . . . To date, he has never paid any money to the . . . [appellees], which they claim is owed to them based upon . . . [Feiler's] agreement to pay a proportionate share of the . . . guarantee, should the need to do so arise. The essence of this case is whether . . . Feiler can be legally required to pay . . . and if so, what amount. . . ."

*—THE ISSUES—*

Feiler asserts that Judge Sklar erred in a number of respects, namely:

"I. The trial judge erred in finding that the oral guarantee of appellant was not within the Statute of Frauds.

    A. Acceptance of collateral liability is within the Statute of Frauds.

    B. Intent of the parties governs the transaction.

    C. The letter of December 20, 1972, is not a writing as required by the Statute of Frauds.

    D. Appellant did not make an admission thereby removing the oral agreement from the Statute of Frauds.

    E. Appellees cannot claim detrimental reliance to extract the oral agreements from the Statute of Frauds.

II. The subsequent renewal of the note without the notification or consent of appellent [*sic*] extinguished his alleged liability.

III. Appellees had a duty to mitigate damages stemming from the obligation to the bank when put on notice that appellant had placed a condition to his acceptance of the obligation which was unacceptable to them."

*—THE LAW—*

I.

Initially, Feiler argues, as he did in the Superior Court, that the oral agreement he made with appellees on December 19, 1972, was an agreement to guarantee "the debt, default or miscarriage" of another. Hence, Feiler says,

the agreement was required by the Statute of Frauds, 29 Car. 2, Cap. 3 [3] as presently codified in Md. Ann. Code art. 39C, § 1, to be in writing in order to be enforceable.[4]

Feiler misconstrues both the original Statute of Frauds and that now in effect in Maryland. The current statute, Md. Ann. Code art. 39C, § 1 (1), provides:

"No action may be brought:

(1) To charge a defendant upon any special promise to answer for the debt, default or miscarriage of another person;

. . . .

Unless the contract or agreement upon which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him."

The essence of the Statute is the promise to answer for the debt, default or miscarriage of *another*. The promise Feiler made to his co-venturers in Togs was to pay them a one-sixth share of the indebtedness they incurred for themselves and him. Feiler did not guarantee to pay to the Bank any portion of the loan the appellees obtained for use in Togs. On the

---

**3.** The Statute was passed by the Parliament in 1676, during what is styled the 29th year of the reign of Charles II. The "reign" apparently is counted from the date of his father's execution.

**4.** The original text as enacted by the Parliament read:

"An bee it further enacted by the authoritie aforesaid That from and after the said fower and twentyeth day of June noe Action shall be brought whereby to charge any Executor or Administrator upon any speciall promise to answere damages out of his owne Estate or whereby to charge the Defendant upon any speciall promise to answere for the debt default or miscarriages of another person or to charge any person upon any agreement made upon consideration of Marriage or upon any Contract or Sale of Land Tenements or Hereditaments or any Interest in or concerning them or upon any Agreement that is not to be performed within the space of one yeare from the makeing thereof unlesse the Agreement upon which such Action shall be brought or some Memorandum or Note thereof shall be in Writeing and signed by the partie to be charged therewith or some other person thereunto by him lawfully authorized."

contrary, he agreed to indemnify the appellees to the extent of one-sixth of any loss they sustained as a result of the bank loan. Feiler's promise to pay, by way of indemnity, was a contract with the appellees. No third party was involved, *ergo,* the Statute of Frauds, past or present, does not apply.

Professor A. Corbin, in his work, *A Comprehensive Treatise on the Rules of Contract Law,* § 385 (1950), states:

> "There is one type of case that presents special difficulties and that has resulted in much conflict of decision. This is a promise to indemnify one who is a surety, a guarantor, or bail for a third person. The following are illustrations: A says to S, (1) 'Indorse P's note to C as surety and I will indemnify you;' (2) 'Guarantee P's debt to C and I will save you harmless'; (3) 'Lend P your credit in the purchase of goods from C and I will see that you lose nothing.' In cases like these the clear weight of authority is that A's promise is not within the statute; but a good many decisions have been contra. . . ." (Footnote omitted.)

L. Simpson, *Handbook on the Law of Suretyship* § 39 (1950), is in accord with the Corbin view. There it is said:

> "The type of indemnity contract which has produced the divergence in cases is the four party situation in which it is alleged that the promisor induced the promisee to become surety for P by promising to save him harmless or indemnifying him. The decided *preponderance of judicial opinion is that a promise to indemnify is not within the statute.*" (Emphasis supplied.)

The *contra* view is discussed in Williston, 3 *A Treatise on the Law of Contracts* § 482 (1960) and Restatement of Contracts § 186 (1932). Those courts that have decided to the contrary of Corbin hold that the indemnitor has by his

agreement implicitly assumed to answer for the principal debtor's obligation.[5]

Corbin, *supra* at section 386, recognizes that approach and addresses it in the following manner:

> "What is the solution of the difficulty? It is believed that mere logic and mere verbal interpretation of the statute afford no certain solution. It must be solved chiefly by a consideration of the policies involved. In considering these policies, the writer ranges himself unhesitatingly with the majority decisions: . . . [the indemnitor's] promise should be held not to be within the statute. In reaching this conclusion he may be somewhat influenced by the conclusion, based upon a reading of some thousands of cases, that the statute of frauds should now be regarded as mainly an *in terrorem* statute to cause important agreements to be reduced to writing and should be allowed to operate as a technical defense in actual cases as seldom as is consistent with uniformity and a reasonable degree of certainty of law. . . .
>
> The first and most fundamental reason underlying the majority decisions is that it is a horrid injustice to let the defendant escape his duty to indemnify after inducing the plaintiff to undertake the suretyship obligation for another person. If the courts have seen reason in so many other classes of cases to narrow the operation of the statute in order to prevent contract breakers from escaping the just penalty, there is certainly no less reason in the present case where the promisee has been induced by the promisor to bind himself for another person in whose welfare he has no interest

---

5. *See, e.g.,* Alabama: Wilder v. Clark, 263 Ala. 55, 81 So. 2d 273 (1955); Mississippi: Craft v. Lott, 87 Miss. 590, 40 So. 426 (1905);
New Jersey: Hartley v. Sandford, 66 N.J.L. 627, 50 A. 454 (1901);
Ohio: Easter v. White, 12 Ohio St. 219 (1861);
Pennsylvania: Rapp v. Snyder, 292 Pa. 400, 141 A. 235 (1928);
Tennessee: Macey v. Childress, 2 Tenn. Ch. 438 (1875).

and to do so on the sole credit of the promise of indemnity.

A second reason is that in these cases there is usually little danger of successful perjury and fraud. If the defendant truthfully denies making the promise the circumstances will corroborate him. The past relations of the promisee with the person for whom he becomes surety can be proved and compared with those between the promisor and such person. Usually it appears that the promisee did not have a sufficient motive for becoming surety for the other person in the absence of indemnity promised, but that the promisor did have such a motive. The 'mischief' against which the statute is supposed to be directed is less menacing in these cases than in others to which the statute is applied.

A third reason is that the statute of frauds was drawn for the protection of persons in the position of the plaintiff rather than those in the position of the defendant. The plaintiff is the surety, not the defendant. At the defendant's request the plaintiff has undertaken to answer for the debt or default of another; and if it happens that that other person is under a duty to exonerate and indemnify the plaintiff, this is a mere accidental accompaniment of and is caused by the defendant's request and promise. The defendant's promise did not grow out of and was not caused by the undertaking of the other person to exonerate and indemnify the plaintiff, making the defendant's promise a mere collateral accompaniment of that other's duty to exonerate and indemnify." (Footnotes omitted.)

Simpson, *supra,* points out that "since the promisor is undertaking to indemnify the surety whether or not the principal debtor is under a liability so to do, the scope of the promise is broader than the liability of the debtor . . . [and] the oral promise cannot be to answer for another's default."

Those courts that hold otherwise, as we have seen, ground

their beliefs on the rationale that the indemnitor's promise to pay the indemnitee is in essence to act as a surety for the principal whose obligation the indemnitee was called upon to satisfy on the principal's behalf. They conclude the indemnitor is but the surety for the principal as to the indemnitee even though he is not a surety as to the obligee. It appears that the indemnitor is viewed as a surety once removed.

72 Am. Jur. 2d, *Statutes of Frauds,* § 239 (1973) states:

> "*The generally prevailing rule in this country, however, is that a promise to indemnify the promisee for becoming surety for a third person, at the request of the promisor, is not within the statute.* It has been pointed out that the decisions in this country announcing the contrary view have been, to a large extent, based on what was at the time considered the English view, but which has been overthrown in the later English cases. Accordingly, a promise by one not a party to a note to one who becomes a surety thereon to save the latter harmless is not within the statute of frauds, at least where the surety acts solely upon the promise. In like manner, a promise by one not a party to a bond to one who becomes a surety thereon to save the latter harmless is held not within the statute of frauds." (Footnotes omitted.) (Emphasis supplied.)

A similar view is expressed in 42 C.J.S., *Indemnity,* § 3 (1944), as follows:

> "*A surety is directly and immediately liable for a debt;* an indemnitor is liable only after unsuccessful efforts by the indemnitee to collect from the debtor. A contract of surety involves a direct promise to perform the obligation of the principal in the event that the principal fails to perform as required by his contract; a contract of indemnity obligates the indemnitor to reimburse his indemnitee for loss suffered or to save him harmless from liability, but

never directly to perform the obligation indemnified. A *contract of suretyship requires three parties, the principal, the . . . [obligee], and the surety, while one of indemnity requires two parties, the indemnitor and the indemnitee.*" (Emphasis supplied.) (Footnotes omitted.)

While it may be argued that the indemnitor's agreement to indemnify the indemnitee is actually a contract to pay the debt, default or miscarriage of the principal, by using the indemnitee as an *alter ego* of the principal, nevertheless, the agreement by the indemnitor runs directly to the indemnitee. It is a contract to pay the indemnitee, not the obligee. Although that agreement might be viewed as a form of surety agreement, the direct promise of the indemnitor to pay the indemnitee for the indemnitee's loss is not within the statute, 2 Corbin on *Contracts, supra* at § 386, unless the parties have a different intention and that intention is made clear. *Ibid.* Such is the holding of the majority of the States that have considered the issue presented in this appeal.[6] We think the majority view to be the better, and we subscribe to it.

The primary purpose behind the Statute of Frauds was to prevent, not foster frauds. The minority outlook on the

---

6. *See, e.g.,* Connecticut: Grillo v. Cannistraro, 147 Conn. 1, 155 A.2d 919 (1959);

Georgia: Flemister v. United Bonding Ins. Co., 122 Ga. App. 422, 177 S.E.2d 182 (1970);

Illinois: Ressetter v. Waterman, 151 Ill. 169, 37 N.E. 875 (1894);

Indiana: Keesling v. Frazier, 119 Ind. 185, 21 N.E. 552 (1889);

Iowa: Kladivo v. Melberg, 210 Ia. 306, 227 N.W. 833 (1929);

Kentucky: Dyer v. Staggs, 217 Ky. 683, 290 S.W. 494 (1927);

Maine: Smith v. Sayward, 5 Me. 504 (1829);

Massachusetts: Chapin v. Lapham, 37 Mass. (20 Pick.) 467 (1838);

Michigan: Boyer v. Soules, 105 Mich. 31, 62 N.W. 1000 (1895);

Minnesota: Esch v. White, 76 Minn. 220, 78 N.W. 1114 (1899);

Missouri: Wahl v. Cunningham, 320 Mo. 57, 6 S.W.2d 576 (1928);

Nebraska: Minick v. Huff, 41 Neb. 516, 59 N.W. 795 (1894);

New York: Tighe v. Morrison, 116 N.Y. 263, 22 N.E. 164 (1889);

North Carolina: Newbern v. Fisher, 198 N.C. 385, 151 S.E. 875 (1930);

Oregon: Rose v. Wollenberg, 31 Ore. 269, 44 P. 382 (1897);

Virginia: Alphin v. Lowman, 115 Va. 441, 79 S.E. 1029 (1913);

West Virginia: Faulkner v. Thomas, 48 W.Va. 148, 35 S.E. 915 (1900);

Wisconsin: Barth v. Graf, 101 Wis. 27, 79 N.W. 1100 (1898).

question of whether promises such as those made in the instant case are surety or indemnity agreements, seems to us to lead to the aiding and abetting of more frauds than it would prevent. To hold the agreement of Feiler to be within the Statute of Frauds and, consequently, unenforceable because it was not in writing, would defeat the purpose of the statute and, simultaneously, approve Feiler's action as a proper business practice. We shall not do so.

## II.

Feiler next posits to us that because the appellees, in concert with Togs, renewed the note at a higher interest rate, he was discharged from all liability on his indemnity agreement. Judge Sklar rejected that contention, observing:

> "The indemnity agreement between ... [Feiler] and the ... [appellees], and the guarantee as between the ... [appellees] and the bank were separate and distinct contracts. ... [Feiler] obligated himself under the contract of indemnity and not under a guaranty. However, he was not a contractual party to the agreement to accept the increase of interest on the guaranteed loan when renewed. Therefore the changes in ... [appellees'] liability for the increased interest on the principal obligation were of no effect on the interest rate of ... [Feiler's] indemnity contract. As a result, the indemnity agreement remains the same as it was prior to the time the $250,000 loan note was renewed at higher interest rates.
>
> Hence, this Court has determined that ... [Feiler] is liable to ... [appellees] under their indemnity contract for one-sixth of $250,000 at 7½ percent interest. Such rate of interest shall be calculated as extending from December 19, 1972, until June 17, 1977, the date the bank was paid the principal on said note in full."

We believe Judge Sklar was correct in holding that the

renewal of the note at a higher interest rate did not affect the indemnity agreement between Feiler and the appellees. Nevertheless, we do not believe that the appellees should recover the full sum awarded to them by the Superior Court.

The record reveals that the original note of $250,000 at 7½% interest per annum was to mature on June 18, 1973. At that time only $200,000 of the sum the bank had agreed to loan to the appellees had been drawn against the loan. The note was then renewed at a higher rate of interest and changed to a demand note. Feiler was not a party to that note, nor did he promise to indemnify the appellees for any payments made by them on the renewed note.

We think it patent that Feiler's obligation under the indemnity agreement did not extend to the final $50,000 drawn on the original note, because it came after maturity of the note and after renewal thereof on different terms. Hence, Feiler's liability is limited, as we see it, to a one-sixth share of $200,000. Since interest was charged by the bank at 7 ½% per annum on the face amount of the original note, *i.e.,* $250,000 from December 18, 1972 to June 18, 1973, Feiler is chargeable with a one-sixth share of that interest.

When we calculate one-sixth of $200,000, we determine Feiler's share of that sum to be $33,333.33. His share of the interest on the $250,000 face amount of the note is one-sixth of that amount or $1,562.50. Thus, Feiler is liable to the appellees in the total sum of $34,895.83, with interest from the date the judgment was entered against him in the Superior Court.

## III.

Finally, in a last-ditch effort to avoid the *sturm und drang* (storm and stress) of the judgment of the trial court, Feiler asserts that the appellees failed to mitigate their damages when notified of Feiler's conditional acceptance of liability, which was not ratified by them, and which they considered to be a breach of the oral agreement. The proviso to which

appellant alludes is that contained in his letter of December 20, 1972, to the appellees in which he stated that he wanted the Executive Committee of Togs to remain the same during the existence of the obligation.

The record contains no indication that the Executive Committee ever changed, nor that Feiler in any wise disavowed the indemnity agreement until such time as he was called upon to make good his word. We fail to see how the damages could have been mitigated where no breach had occurred.

## —SUMMARY—

We conclude that Judge Sklar properly held the indemnity agreement to be without the Statute of Frauds; that Feiler was liable on his oral promise to pay a proportionate one-sixth share of $200,000 of the principal and one-sixth of 7 ½% interest for six months on $250,000; that Feiler's word was, indeed, his bond and that the "bond" was, under the circumstances, "payable to bearer"; that the Superior Court erred in assessing damages against Feiler on the principal in excess of $200,000 and on interest that accrued after maturity of the original note. We, therefore, modify the judgment of the Superior Court of Baltimore City by entering a judgment against Feiler in the amount of $33,333.33, plus interest of $1,562.50, a total of $34,895.83.

> *Judgment modified in accordance with this opinion and as modified, affirmed.*
>
> *Costs to be paid by appellant.*