Curlee BRAZELL, Plaintiff-Respondent,

v.

ST. LOUIS SOUTHWESTERN
RAILWAY COMPANY,
Defendant-Appellant.

No. 43073.

Missouri Court of Appeals,
Eastern District,
Division One.

Feb. 2, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 19, 1982.

Application to Transfer Denied
May 17, 1982.

---

**3.** We do not consider whether the remainder of plaintiff's evidence is relevant and has probative value.

John R. Musgrave, St. Louis, for defendant-appellant.

Don B. Sommers, St. Louis, for plaintiff-respondent.

LACKLAND H. BLOOM, Special Judge.

This is an appeal by St. Louis Southwestern Railway Company from a judgment in favor of Curlee Brazell in the sum of $265,-000.00 rendered after jury verdict in this Federal Employers' Liability Act case. The parties will be referred to as plaintiff and defendant in accordance with their status in the trial court.

The evidence established that plaintiff, Curlee Brazell, was at the time of trial 33 years old. He was employed by defendant in Pine Bluff, Arkansas in 1972 as a machinist helper. On October 10, 1977 he was working as a machinist with J. D. Hill and was engaged in cutting a flange on one of defendant's switch engines at defendant's round-house facilities in Pine Bluff, Arkansas. A flange is the inside lip on a locomotive wheel that holds the wheel on the track. The part of the wheel in contact with the track wears down over a period of time but the flange does not. To prevent the flange from extending too far beyond the surface of the wheel which might cause a derailment, the flange must be cut or trimmed down. This is done by removing the brake shoe and placing a cutting tool in its place. The cutting process is obtained by the locomotive engineer or "hostler" applying brake pressure as the locomotive is slowly moved. As this is done the cutting

tool peels off the excess length of the flange. Friction between the tool and the flange generates a great deal of heat and this is reduced by applying oil to the flange. As the wheel slowly turns, the oil on the flange comes into contact with the cutting tool lubricating it.

On the date of the accident plaintiff was cutting a flange on a wheel on one of two switch engines coupled together. The flange was being cut on the wheel of a trailing engine which was being pulled by the lead engine. The two engines were being operated in a southernly direction on what was referred to as number 10 rail at a speed of less than one mile per hour. As it was clearing number 10 switch it was collided with by a consist of two road engines coming south at one to two miles per hour on rail 10 and attempting to pass number 10 switch. The road engine clipped a corner of the switch engine causing some damage to the hand rails and steps. At the time plaintiff testified that he was on the ground bent over the locomotive wheel oiling the flange using a five gallon container with a spout furnished him by defendant which was placed above him on the locomotive running board. He was regulating the flow of oil through a rubber hose by means of his fingertips. Plaintiff testified that the collision caused the far side of the switch engine to come a few inches off the tracks and lean toward him. His head was forced downward by the running board pushing his chin into his chest and "popping" his neck. Plaintiff attempted to free himself but his arm was pinned. He pushed away freeing his arm and ran clear fearing the engine was going to fall on him.

Shortly after the collision, a number of defendant's employees including the hostler who was operating the switch engine and his foreman asked plaintiff if he had been hurt and he said he was not.

That evening after he had gone home plaintiff called in and complained of a pain in his neck and was told to come in and make out an accident report. He did so and was then taken to the hospital.

Defendant does not challenge the sufficiency of the evidence to support a jury finding that the accident was caused by its negligence but, among other alleged errors raised, asserts that the court erred in not submitting the issue of plaintiff's contributory negligence to the jury and further briefs and argues points of alleged error which will require a detailed review of the evidence pertaining to plaintiff's injuries. To avoid unnecessary duplication, evidence pertaining to such issues will be set forth in connection with a discussion of the points raised.

I.

Defendant's first point charges the trial court with prejudicial error in not permitting it at the close of all the evidence to amend its answer to charge plaintiff with contributory negligence and thus refusing to read to the jury defendant's Instruction Nos. 12 and 14 submitting to the jury the issue of plaintiff's contributory negligence.

This accident occurred, as heretofore indicated, at Pine Bluff, Arkansas on October 10, 1977. Suit was filed on November 21, 1978 and defendant filed its answer, a general denial on April 17, 1979. Thereafter there was extensive discovery, including depositions of plaintiff, a number of employees of defendant, and medical witnesses for both plaintiff and defendant. The trial commenced on April 7, 1980. Defendant made no effort to amend its pleading to allege contributory negligence of plaintiff until the instruction conference held just prior to the conclusion of the evidence, at which time it tendered to the court Instruction No. 12 charging plaintiff with contributory negligence in that "plaintiff failed to use the oiling equipment provided by the defendant."

Prior to the case being submitted to the jury the next day, plaintiff testified in rebuttal and defendant's employee H. K. Kalkbrenner, testified in surrebuttal. As a consequence of this testimony defendant again requested the court for leave to amend its answer to assert plaintiff's contributory negligence on the additional

ground that plaintiff placed his arm up under the engine." Said request was denied. Defendant also orally dictated into the record its requested Instruction No. 14 which was refused. The court granted defendant's request to later file the instruction in written form. Plaintiff objected to both requests for amendment of the pleadings and to the giving of Instruction Nos. 12 and 14 on the ground that plaintiff's contributory negligence was neither pled nor supported by the evidence.

Defendant concedes that contributory negligence was not pled but argues that it became a contested issue for the first time during trial and was tried by implied consent of both parties and that under Supreme Court Rule 55.33(b) the court erred in not granting leave to amend the pleadings to conform to the evidence. Plaintiff, on the other hand, argues that defendant's defense and its evidence was always, before and during trial, that plaintiff was not in a position at the time of the accident to sustain any injury and that he was not hurt.

Before reviewing the evidence on which defendant relies, we set forth certain established applicable principles of law.

■ Defendant was entitled to have the issue of contributory negligence submitted to the jury if the pleadings and evidence supported it. *Wyatt v. Southwestern Bell Telephone Co.*, 573 S.W.2d 386, 390 (Mo.App.1978); *Orloff v. Fondaw*, 315 S.W.2d 430, 434 (Mo.App.1958). The spirit of our rules is to permit amendments when justice so requires. Rule 55.33(a). The trial court has wide discretion in granting or denying leave to amend which discretion will not be overturned on appeal unless there is an obvious and palpable abuse thereof. *East v. Landmark Central Bank and Trust Co.*, 585 S.W.2d 222, 225–6 (Mo. App.1979). Trial courts have been admonished to be liberal in allowing such amendments. *C. S. v. J. W.*, 514 S.W.2d 848, 854 (Mo.App.1974). Where evidence is admitted without objection, on appeal we will consider that the pleadings were amended to conform to the evidence. *Moranz v. Schiller*, 525 S.W.2d 785, 787 (Mo.App.1975). Is-

sues not raised by the pleadings but tried by express or implied consent shall be treated in all respects as if they had been raised by the pleadings. Such amendments can be made to conform to the evidence at any time even after judgment. *Middleman v. Complete Auto Transit, Inc.*, 486 S.W.2d 456, 461–2 (Mo. banc 1972); Rule 55.33(b). Before evidence admitted without objection will give rise to amendment of the pleadings by implied consent under Rule 55.33(b) such evidence must bear only on that issue and not be relevant to an issue already in the case. *Smith v. Heisserer*, 609 S.W.2d 485, 486 (Mo.App.1980); *Gee v. Gee*, 605 S.W.2d 815 (Mo.App.1980).

■ With these principles in mind we review the introduction, nature, and sufficiency of the evidence alleged to bear on plaintiff's contributory negligence, keeping also in mind that in reviewing the same that it is to be viewed in a light most favorable to defendant, giving defendant the benefit of any favorable inferences that may reasonably be drawn therefrom, and disregarding plaintiff's evidence unless it tends to support the charge of contributory negligence. *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417, 421 (Mo. banc 1973).

■ Instruction No. 12 tendered by the defendant and refused by the court was a submission under MAI 32.07 and was as follows:

"You must find the plaintiff contributorily negligent if you believe:

First, plaintiff failed to use the oiling equipment provided by the defendant, and

Second, plaintiff's conduct was negligent, and

Third, such negligence of plaintiff directly contributed to cause his injury."

Plaintiff, in testifying as to how he went about oiling the flange, stated: "Well, it takes plenty of oil. You have to have a lot of oil to cut one flange so I had a five gallon can that had a hose running to the can and a little faucet and I cut the faucet on and I set the can up on the running board." He said he set the can on the

running board where it wouldn't fall off. He indicated on plaintiff's photographic exhibits how he then reached in and with the hose in hand bent over to oil the flange. This testimony was obviously elicited to place plaintiff in a position to be injured by the collision of defendant's engines. In view of defendant's general denial and the extensive pre-trial discovery including the depositions of defendant's employees present at the scene of the accident, plaintiff could reasonably anticipate that defendant's defense would be that plaintiff was not in a position to be struck by any portion of the engine as he contended. In fact the hostler on the switch engine that was pulling the one plaintiff was working on did testify that he was keeping his eyes directly on plaintiff watching him as he would cut the flange. At the time of the collision plaintiff "was walking alongside the engine kind of bent over looking up under it about three feet—I say three feet from the engine. He was watching the tool as it cut the wheel." He was then asked by counsel for defendant:

"Q Did he have any part of his body up under any part of the engine that you saw?

A No, he had his hands down to his side like that as you would when you bend over like that."

Defendant does not deny that at this point no issue of contributory negligence had entered the case but insists that plaintiff injected the issue for the first time in his cross-examination of plaintiff's foreman Henry Kalkbrenner when he asked him:

"Q Is there any such thing as a five gallon can with a rubber hose and a—

A Not rubber.

Q Well, a hose with a faucet on it?

A A copper hose."

On redirect he testified that rubber hoses were not available to the men "through me." The railroad made available a container with a valve and a copper tubing on it or a pump oil squirt can.

Plaintiff points out that contrary to defendant's assertion that plaintiff first injected the issue as indicated above that

Kalkbrenner testified on direct examination that men oil the flange in two different ways depending on how they like to do the job. One way is to walk along with a squirt can and another to use a container with a spigot or a valve on it and "then a copper tubing coming out of it that you can situate over the flange and set it up to just drop on the flange . . . ." The thrust of Kalkbrenner's testimony was directed to fortifying defendant's position that the injury to plaintiff could not happen the way plaintiff claimed it did. The inference was that he did not use a can with a rubber hose, it was not available to him and a can with a copper tube would not permit him to insert his arm in over the wheel. We believe this testimony was not offered at the time to establish contributory negligence on plaintiff's part; that the direct and cross-examination went directly to the basic issue of whether plaintiff's injuries, if any, occurred as he testified. It was a question of credibility between plaintiff on the one hand and defendant's hostler and Kalkbrenner on the other. Accordingly we do not believe the issue of contributory negligence raised by Instruction No. 12 was tried by mutual or implied consent of the parties.

Even assuming the evidence had been offered and received on the alleged issue of contributory negligence, we find defendant has failed to sustain its burden of showing in what way the use of a copper tube in lieu of a rubber hose would have prevented plaintiff's injuries. Everyone, including Kalkbrenner, testified that at some time in the oiling process, it would be essential for the oiler to bend over and place the tube or hose near or above the flange. In fact Kalkbrenner, in his deposition taken before trial and read by plaintiff, stated that the use of a "hose" out of a five gallon can is a proper procedure. We conclude that the court did not err in refusing defendant's Instruction No. 12.

■ Defendant offered Instruction No. 14 as follows:

"You must find the plaintiff contributorily negligent if you believe:

First, plaintiff placed his arm up under the engine, and

Second, plaintiff was negligent, and

Third, such negligence of plaintiff directly contributed to cause his injury."

As previously indicated this instruction was orally requested by defendant after the instruction conference and following rebuttal and surrebuttal testimony of plaintiff and Kalkbrenner immediately prior to the submission of the case to the jury. Defendant agrees that prior to the instruction conference the dispute regarding where plaintiff placed his arm under the engine was confined to the issue of credibility. Defendant states that plaintiff had indicated on his Exhibit 4 with a white dot the place where he had inserted his arm and that Kalkbrenner had testified that he could not have reached in at that point. Defendant argues that after the instruction conference, plaintiff testified that the way Kalkbrenner illustrated how to oil the flange in defendant's photographic exhibits was not appropriate for him as he might stumble and fall under the wheel. Defendant put Kalkbrenner back on the stand and he testified that although one could reach in and oil a flange where plaintiff indicated in rebuttal on defendant's Exhibit I, he could not do so while the engine was moving as it would be unsafe. He testified the safe way would be the way he illustrated on defendant's Exhibit I and that is the way the men are instructed to do it. Defendant argues this evidence, presented for the first time in rebuttal and surrebuttal, was sufficient to require the submission of plaintiff's contributory negligence as set forth in Instruction No. 14. Defendant's point is that plaintiff injected the issue on rebuttal by eliciting the above testimony and by changing the point at which he reached in to oil the flange to counteract defendant's testimony that he could not reach in where he had first indicated on plaintiff's Exhibit No. 4. Thus, defendant contends the plaintiff put in issue the question of the safe method by testifying that his method was safe and Kalkbrenner's was not appropriate for him as it would put him under the wheel if he stumbled. Plaintiff answers that the testi-

mony again went to credibility to counter Kalkbrenner's testimony that there was only one place where an oiler could reach under the engine. The purpose, plaintiff says, of the rebuttal testimony was to impeach Kalkbrenner in that respect and to show that there were other places where one could reach in, a fact which Kalkbrenner admitted on cross-examination but testified would be unsafe.

We agree that the evidence fails to raise any issue of contributory negligence. The sole issue during the trial was whether or not at the time of the collision plaintiff had his arm and body under the engine at all. The case was pled and tried on that issue alone and defendant's last minute effort to convert what we conceive to be legitimate impeachment testimony into a trial of contributory negligence by consent is not warranted by the evidence. Thus none of the stated principles relative to the amendment of pleadings apply either as to Instruction No. 12 or 14, and the trial court properly denied the motion to amend and properly refused the giving of Instruction Nos. 12 and 14. Even had contributory negligence been pled the evidence presented would not have justified the submission of the issue to the jury either from a negligence or causal standpoint.

## II.

Defendant next charges the trial court with error in sustaining plaintiff's objection to defendant's cross-examination of plaintiff regarding the taxes he would have paid on his lost earnings.

Plaintiff testified as to wages lost from the date of the accident up to the date of the trial, amounting to $25,143.33. Defendant sought to elicit from plaintiff how much of that total the plaintiff would estimate he would have paid taxes on. Objection was sustained.

Defendant claims sustaining the objection was error in this F.E.L.A. case under the holding of the United States Supreme Court in *Norfolk & Western Railroad v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62

L.Ed.2d 689 (1980). Although the court gave to the jury Instruction No. 8 to the effect that any award in favor of plaintiff would not be subject to income taxes and such taxes should not be considered in fixing the amount of any award, defendant states the court refused to allow defendant to introduce any evidence relevant to that instruction. In *Norfolk, supra,* handed down February 19, 1980, less than two months before the commencement of this trial, the U. S. Supreme Court for the first time held that in a F.E.L.A. case it was reversible error in a state court to exclude evidence of the income tax payable on the injured party's past and estimated future earnings and to refuse to instruct the jury that the award of damages would not be subject to income taxation. Instruction No. 8 complied with the second requirement. The ruling of the trial court sustaining plaintiff's objection to defendant's question as to estimated taxes prevented the first requirement.

Plaintiff points out that defendant made no offer of proof after the objection was sustained and this court is without any evidence upon which to base a finding as to what plaintiff's tax liability, if any, would have been. Such proof by an expert witness was offered and refused in the *Norfolk* case and the court was thus in a position to weigh the prejudice to defendant of the court's refusal to admit the evidence. The general rule is that nothing is preserved for appellate review when a court rejects evidence in the absence of an offer of proof except in instances where the plain error rule is applicable. *Hays v. Western Auto Supply Co.,* 405 S.W.2d 877, 881 (Mo. 1966); *Tile-Craft Products Co. v. Colonial Properties, Inc.,* 498 S.W.2d 547, 549 (Mo. 1973). Defendant in reply cites *Wahl v. Cunningham,* 320 Mo. 57, 6 S.W.2d 576 (banc 1928) for authority to the effect that if it is clear as to what the testimony of the witness would have been no offer of proof is required. In this case defendant states that "clearly such an amount" (plaintiff's lost wages) "would have been subjected to some tax liability and the testimony which defendant wished to adduce from the plain-

tiff was clearly known to the trial court." If it was, we fail to find it in the record and defendant does not so enlighten us. What, if any, taxes plaintiff would have been subjected to is dependent on too many variables and we would have to engage in pure speculation to make such determination. In view of the extensive pre-trial discovery proceedings available to defendant it would have been a simple procedure for defendant to obtain the information it sought before trial, probably from its own employment withholding records, and to present as an offer of proof expert testimony on the issue involved as in the *Norfolk* case, *supra.*

Defendant invites us to consider the point as plain error and cites *Jenni v. E. R. B. Land, Inc.,* 541 S.W.2d 743 (Mo.App.1976) and *Smith v. J. J. Newberry Co.,* 395 S.W.2d 472 (Mo.App.1965). In *Jenni* the court found that manifest injustice would result under the facts by upholding the exclusion of evidence. *Smith* was not a case involving the failure to make an offer of proof following a ruling excluding evidence as in fact such an offer was made. The court based its reversal on the contents of the offer of proof despite the failure of appellant to otherwise preserve the point for appellate review, to avoid a miscarriage of justice.

In the absence of some evidence before us as to plaintiff's income tax status, we are unable to say that refusal of the court to overrule plaintiff's objection constitutes plain error so as to be deemed a "manifest injustice or miscarriage of justice" within the contemplation of Rule 84.13(c).

III.

Defendant next charges error in the court's refusal to give its tendered Instruction No. 11. This instruction is as follows:

"If you find in favor of plaintiff and decide to make an award for any loss of earnings in the future, you must take into account the fact that money awarded by you is being received all at one time instead of over a period of time extend-

ing into the future and that plaintiff will have the use of this money in a lump sum. You must therefore determine the present value or present worth of the money which you award for such future loss."

The court gave to the jury MAI 4.01 on damages. A refusal to give an identical instruction as No. 11 was recently upheld by the Supreme Court in *Dunn v. St. Louis-San Francisco Railway*, 621 S.W.2d 245 (Mo. banc 1981) Cert. denied sub. nom., —— U.S. ——, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982), a F.E.L.A. case, the court stating, "Instruction 7, a damage instruction authorized by MAI 4.01 was given in this case. Any further explanation of the MAI damages instruction by the tendered Instruction E is not acceptable procedure under MAI." *Id.* at 253. Defendant's proffered Instruction No. 11 was properly refused.

### IV.

██ Defendant argues that the court erred in refusing to give to the jury Instruction No. 9 as follows:

"The evidence that plaintiff may at some time in the future sustain wage loss is withdrawn from the case and you are not to consider such evidence in arriving at your verdict."

Defendant in support of its position cites medical testimony to the effect that plaintiff could do light work such as an inspector's job if he avoided unusual strenuous positions. Plaintiff himself testified that he would be able to do the work of a Federal Inspector. Defendant offered evidence that plaintiff had sufficient seniority to obtain a Federal Inspector's job and that there were ten full-time men holding Federal Inspector jobs whom he could "bump" and take the job, which according to defendant paid more than the job plaintiff held at the time of the accident. Defendant argues, therefore, that there was no evidence that plaintiff would sustain any wage loss in the future. The difficulty with defendant's position is that we fail to find in the record evidence of future wage loss to which the tendered instruction would

be applicable, nor does defendant direct our attention to such evidence. Defendant admits that there was evidence to support "some degree of permanent personal injury" and that MAI 4.01 was therefore appropriate. Plaintiff did not argue any specific future wage loss but did argue that under the medical evidence "he's never going to get well . . . he's going to lose time . . . ."

Defendant cites the Committee's comment in the notes under MAI 34.02 that the use of a withdrawal instruction "is not limited to withdrawing evidence which is accidently or improperly admitted. It is intended rather to clarify what the jury is to consider in assessing damages." *Id.* n.1. We do not find that the jury was misled into giving undue emphasis of any future wage loss, if any, to plaintiff by the refusal of the court to give Instruction No. 9. The giving or refusal of a withdrawal instruction is within the sound discretion of the trial court and we find no abuse of that discretion in this case in refusing to give the requested instruction. *Helming v. Adams*, 509 S.W.2d 159, 169 (Mo.App.1974).

### V.

██ Defendant next contends that the trial court prejudicially erred in overruling its objection to the testimony of Dr. Jacques P. Schaerer to the effect that plaintiff's low back pain was discogenic. Defendant argues that said testimony was not based upon a reasonable degree of medical certainty and permitted the jury to award damages for a disc injury upon evidence that was based on speculation and conjecture. This and defendant's remaining points of error require a review of the extensive medical evidence adduced in this case, some of which, such as Dr. Schaerer's testimony, was offered by deposition.

Plaintiff testified that when the collision occurred his head was forced down and he was pinned in under the running board of the engine and could not pull himself out. "My neck popped like." He got himself free and ran fearing the locomotive was going to fall over on him. As previously set forth, at the site of the accident and imme-

diately thereafter plaintiff indicated to his foreman that he was not hurt. Other employees testified that he also told them at the time or shortly thereafter that he was not hurt. He said he felt "real scared and I was kind of weak." He went to the lunch room and laid down on a bench for about an hour resting. Afterwards he finished his work day assisting another employee in oiling a flange. Plaintiff said pain had started in his neck before he left the job for the day. It felt like "tickling me with a straw or something in the back of my neck." By the time he got home it had turned into pain and he called back and asked to be sent to the hospital. He was told to come in and make an accident report and was taken to Jefferson Hospital in Pine Bluff where he saw Dr. Sullenberger, the company doctor. He was complaining of pain in the upper portion of his back and neck. After x-rays proved negative, he was given medication and sent home.

Plaintiff testified that the next day his back and side were hurting and by the time he was supposed to return to work he couldn't move his head either way. Dr. Sullenberger put him on therapy for about two weeks. He then went back to work cutting flanges but got cramps in the neck and worked for only three hours. Dr. Sullenberger told him there was nothing more that he could do for him.

Dr. Sullenberger testified for defendant that he is in general practice in Pine Bluff. He first saw plaintiff on October 10, 1977, the evening of the accident, in the emergency room of Jefferson Hospital. He was complaining of pain in the cervical and lumbar spine. X-rays were normal and his examination revealed that plaintiff had full range of motion both in the neck and back. He found no muscle spasm, no limitation of motion, or other abnormal findings. He ordered medication, a muscle relaxant, and heat treatments at home. He could find no objective symptoms to support plaintiff's complaints of pain. He did not release him, however, to return to work until November 3, 1977. On October 17, plaintiff was still complaining of pain and he started physiotherapy at Jefferson Hospital. He saw him

again on November 4, 1977 and plaintiff was still complaining of pain and he advised him to see either a neurosurgeon or an orthopedic surgeon. He testified that his charges were paid by defendant and that he had no independent recollection of plaintiff and was able to testify only from his notes.

Plaintiff testified that after he left Dr. Sullenberger he went to the Veterans Administration Hospital in Little Rock where he was seen by Dr. James B. Searcy on November 8, 1977. Dr. Searcy's deposition was read on behalf of plaintiff. Plaintiff was complaining of neck and low back pain. The doctor stated that at the time apparently the low back pain was not very severe. His examination revealed tenderness at the base of the neck with pain radiating to the left shoulder. There was no neurological deficit. X-rays were negative. He prescribed a soft cervical collar and some muscle relaxants. He saw him once more and in February, 1978 referred him to neurosurgery "to see if they could find anything I could not find." His finding was "essentially the signs of a bad neck sprain at the base of the neck." He was treated in the hospital with hot packs, given home exercises for his neck and advised to continue wearing his collar. The doctor testified as near as he could tell the train accident caused plaintiff's injury; that it is painful and very apt to recur, but he agreed with defendant that "[i]t may completely heal and that be the end of it." He said in February, 1978, hospitalization was not indicated and because of V.A. policy plaintiff was referred to his family doctor.

Dr. C. A. Flowers, plaintiff's regular doctor, testified that he had previously treated plaintiff for some eleven years. He saw him in November, 1977 and referred him to the Physiotherapy Department of Jefferson Hospital. He did not treat plaintiff for his injuries and saw him only once or twice. On April 4, 1978 after the therapy treatment he released him to go back to work. On December 9, 1978, plaintiff returned and complained of backaches. He said he was unable to determine the cause and advised him to see an orthopedic surgeon again.

He said he did not find anything disabling at the time and thought he was able to work.

Plaintiff testified that he went back to his job doing heavy work and his neck and back started hurting and cramping. He again laid off and went to see Dr. Harold Bierman, a chiropractor in Pine Bluff. He received ultrasound therapy every day for a month and after that twice a week. He seemed better and went back to work but he could not sleep at night and went back to Dr. Bierman who gave him more therapy and recommended to his employer that he be put on light duty. However, plaintiff testified that he was told that there was no light duty available at that time.

Dr. Bierman testified that plaintiff first came under his care on June 8, 1978. He complained of pain and soreness in his neck, his left arm, and in his low back. He found a subluxation (incomplete dislocation) of the first and second theracic vertebra due to misalignment with radiculities, grade two, and incomplete dislocation of the fifth lumbar vertebra and associated with the sacrum, and left sacroiliac with radiculities, grade one.[1] He treated him with manual manipulation of the joints with some physiotherapy equipment, ultrasound, infrared heat, and manual massage. He saw him on seventy-two different visits giving him basically the same type of treatment each time. He agreed that he was essentially treating plaintiff for a strain and sprain of the cervical and lumbrosacral region of the spine. His total fee in the sum of $1,028.75 was paid by defendant. He was of the opinion that plaintiff could go back to work but cautioned him to be on guard against going into unusual strenuous positions.

Plaintiff testified that at the time of trial he was still seeing Dr. Bierman every two weeks. The treatment he got from him cut down the pain, relaxed his muscles and let him sleep at night.

In May, 1978, plaintiff was sent by his counsel to see Dr. Jacques Schaerer in St. Louis. He was complaining of neck cramps and lower back pain. He said the lower back pain was not as bad as his neck pain and said Dr. Schaerer did not examine his back at that time. In August, 1978, he returned and complained of his back but does not recall if Dr. Schaerer then examined it.

Dr. Jacques Schaerer's deposition was read into evidence on behalf of plaintiff. He testified that his specialty was neurological surgery. He first saw plaintiff on May 25, 1978 at which time he complained of constant neck pain, left shoulder pain, frequent headaches at the base of the skull and occasional low back pain. His examination revealed limitation of lateral motion in the neck, movement being limited about ten percent and spot tenderness over the upper medial angle of the right shoulder blade. X-rays of the cervical and upper thoracic spine were normal. His impression was that plaintiff showed a "residual pain following a severe sprain of the thoracic-cervical junction, namely the area where the neck portion and chest portion of the spine join. There was no evidence of nerve root involvement."

He again saw plaintiff on June 7, 1978 and he was complaining that the neck pain was worse. The only finding at that time was that he "still had localized spot tenderness at the base of the neck close to the midline." His diagnosis was "one of a ligamentous sprain at the base of the neck." He saw plaintiff again on March 31, 1980, just before his deposition was taken, at which time plaintiff was complaining of low back pain, neck pain, and shoulder pain. The limitation of the movement of the neck had increased to twenty percent of normal. He diagnosed the neck pain as "cervical facet sprain syndrome" and over objection of defendant the following diagnosis of the low back was admitted:

"As far as the low back is concerned, I made a diagnosis of a chronic low back pain, activity related, most likely, or conceivably, discognenic. By that I mean that a functional failure of a disc in the low back would have the result of, again,

1. None of the other medical testimony substantiated those findings of Dr. Bierman.

placing strain on the facet joints, and so, basically, again, it would be a facet pain associated with disc failure in the low back, but no evidence for herniation of a disc. There is no radicular or nerve root changes. It would, simply, be a mechanical stress on the facet joints resulting in pain due to a failure of a disc."

In response to a hypothetical question read to the jury over defendant's objection that it assumed facts not supported by the evidence, Dr. Schaerer gave his opinion that the conditions he diagnosed were the result of the accident and that plaintiff would continue to have activity related pain which will vary in intensity, but will continue to be substantial. He testified that plaintiff could continue to do light work without "severe pain" that would not force him to stop working.

Dr. Joseph Hanaway testified on behalf of plaintiff that he specializes in clinical neurology and that he examined plaintiff on January 31, 1980. He was complaining of intermittent neck pain and low back pain. He found some limitation of movement in the neck from side to side because of pain. There was tenderness to palpation of his muscles around his back and complaints of pain when he bent over less than ninety degrees and in straight leg raising. There was muscle spasm in the back. His diagnosis was that plaintiff had "a chronic recurrent neck and low back strain problem involving muscles mostly. There was no evidence of nerve compression that one sees with a slipped disc such as pain radiating down the back of the leg or down the arm. So this is it, a chronic recurring soft tissue muscle strain." He expressed the opinion that the accident of October 10, 1977 caused plaintiff's condition which plaintiff is going to have the rest of his life and that he would have pain even if he stayed at home and did not work. He thought that plaintiff was feigning weakness in his arms and legs and as to certain claimed sensations, but that his complaints of pain were real and not feigned.

Dr. Roger L. Mell, an orthopedic surgeon in St. Louis, examined plaintiff at the request of defendant on October 17, 1979. Plaintiff was complaining of some neck cramps and discomfort in the neck and low back and pain when he did a great deal of walking. Dr. Mell took x-rays of the cervical and lumbar spine and did a complete orthopedic examination. The x-rays were normal. He found no objective evidence of injury to support plaintiff's complaints of pain or anything that would prevent him from performing his work. He was of the opinion, based on plaintiff's history, that he had a soft tissue strain as a result of the accident.

Plaintiff testified that up until January 14, 1980, when he last worked, he tried to work as many days as he could. He was assigned to the "pit" in January, 1980 putting brake shoes on and greasing locomotives. He would have to bend over and do lifting while doing the job which he said he could not do. He felt he could do tool room work and light maintenance. He said before he became a machinist he was an inspector and could do that work but that after the accident he was never reassigned to do that type of work.

Plaintiff testified that he lost $3,334.31 wages in 1977, $12,395.62 in 1978, $4,834.40 in 1979 and $4,584.00 in 1980, totaling as of the date of trial $25,148.33, neither taking into consideration wage increases during the period or extra pay for holidays and overtime nor giving credit to defendant for time he might have otherwise lost for reasons other than his injury.

As indicated, defendant complains that Dr. Schaerer's testimony as to the cause of plaintiff's low back pain was speculative and not based on reasonable medical certainty. We disagree.

Dr. Schaerer's first diagnosis was that plaintiff suffered a "ligamentous sprain at the base of the neck." He later diagnosed the neck pain as a "cervical facet sprain syndrome." As far as the low back, his diagnosis was one of "a chronic low back pain." He then stated, as an explanation of the pain, that it was "most likely, or conceivably, discongenic. By that I mean that a functional failure of a disc in the low back

would have the result of, again, placing strain on the facet joints, and so basically, again, it would be a facet pain associated with disc failure in the low back, but no evidence for herniation of a disc. There are no radicular or nerve root changes. It would, simply, be a mechanical stress on the facet joints resulting, in pain due to a failure of a disc." He was of the opinion that based on reasonable medical certainty the accident was the cause of plaintiff's condition, to wit: a ligamentous and cervical facet sprain. The medical history available to him,[2] his three examinations of plaintiff, the facts hypothesized to him were a sufficient foundation for his opinion. The explanation of the cause of pain as "most likely, or conceivably discogenic" was under the evidence permissible as a medical expert's explanation of the pain plaintiff was experiencing. *Jones v. Terminal R.R. Association*, 363 Mo. 1210, 258 S.W.2d 643 (1953); *Stephens v. Guffey*, 409 S.W.2d 62 (Mo. 1966).

Defendant cites *Hahn v. McDowell*, 349 S.W.2d 479 (Mo.App.1961) and *Kiger v. Terminal Railroad Association*, 311 S.W.2d 5 (Mo.1958) in support of its position. In *Hahn*, one doctor testified as to the future expectation of a scar on plaintiff's right thigh. He testified that there "was a greater possibility of developing cancer in the future in the site of the scar." Another doctor testified as to "three possibilities" resulting from this type of burn scar, one of which was cancer of the skin. The case was reversed on appeal, the court holding the medical testimony failed to establish that cancer was reasonably certain to result. The case involved *future* damages or injuries, not as here, the explanation of the present cause of pain.

In *Kiger*, the doctor's testimony as to the presence of a ruptured disc was so contradictory that the court doubted that it was sufficient to sustain the doctor's conclusion.

We do not believe Dr. Schaerer's opinion is barred by these decisions. There was no indication that now or in the future plaintiff would require a disc operation or special treatment for the condition. We doubt that the jury was misled into giving undue emphasis either to a present or future serious disc involvement, especially in view of the doctor's opinion that there was no evidence of a herniated disc or any nerve root changes.

## VI.

■ Defendant next contends that the court erred in permitting Dr. Schaerer to answer a hypothetical question on causation for the reason it assumed facts not supported by the evidence. Defendant argues that failure to sustain its objection permitted the jury to find that plaintiff's low back problem was the result of the accident. Defendant's objection, which was overruled, went to the following portion of the hypothetical question:

"[t]hat he [plaintiff] therefore went to the Veterans' Administration Hospital, the Jefferson Hospital, and the doctor that he was sent to by the company didn't want to treat him anymore so he went to the Veterans' Hospital, that he's a veteran and he was entitled to go there; that he went to the Veterans' Hospital in Little Rock, in North Little Rock, Arkansas, where he was examined and found to have a severe strain of the neck and back according to their diagnosis ...."

Defendant's objection was that there was no evidence that the Veterans' Hospital had diagnosed the plaintiff as having a severe strain of the back. The Veterans' Administration's records are not before us. Plaintiff states that the reference to Veterans' Hospital was a misnomer and that the reference should have been to Jefferson Hospital. We have examined the records of Jefferson Hospital read into evidence and find numerous references to back pain but no finding of a severe strain of the back. Nevertheless, as we have previously detailed, there was ample evidence that plaintiff was continuously complaining of back pain. He was given therapy and medication for the same at Jefferson Hospital

---

**2.** Plaintiff had complained to every doctor who saw him of low back pain.

and treatment by Dr. Bierman. Plaintiff has complained on each visit to Dr. Schaerer of back pain. We do not believe in view of the evidence as herein indicated and the reasonable inferences to be drawn therefrom that the reference to Veterans' Hospital in the extremely long and complicated hypothetical question was prejudicial. We believe the hypothetical question included the essential elements shown by the evidence. The trial court did not abuse its discretion in overruling defendant's objection. *Schmitt v. Pierce*, 344 S.W.2d 120, 130 (Mo. banc 1961); *Conlon v. Roeder*, 418 S.W.2d 152 (Mo.1967).

### VII.

Finally, defendant contends that the verdict of $265,000.00 is "so grossly excessive as to be the obvious result of unbridled passion and prejudice on the part of the jury ... and bears no reasonable relationship to the plaintiff's proven damages."

■ In reviewing that charge we are guided by the proposition that to be held so grossly excessive as to indicate bias and prejudice on the part of the jury there must be a showing that the jury was guilty of misconduct in fixing the amount of the verdict as "a result of bias and prejudice engendered during the course of the trial." Such misbehavior necessitates that the verdict in its entirety be set aside. *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 788 (Mo. banc 1977); *Skadal v. Brown*, 351 S.W.2d 684, 690 (Mo.1961); *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945 (Mo.App.1978).

Defendant recognizes that this court cannot infer bias, passion and prejudice from the size of the verdict alone and that defendant must show some "incident or occurrence" which created the alleged bias. *Arkansas-Missouri Power Co. v. Haines*, 592 S.W.2d 883, 885 (Mo.App.1980). In undertaking to sustain that burden, appellant argues that all of the trial court's errors heretofore set forth in its brief clearly demonstrate, together with the excessive amount of the verdict in the amount of $265,000.00, that the jury was motivated by bias, passion and prejudice against the defendant.

■ We disagree. Firstly, we have carefully reviewed the defendant's allegations of trial court error and found them without merit. Secondly, even assuming the validity of any or all of such alleged errors, we fail to see how that alone would be proof of an "obvious result of unbridled passion or prejudice on the part of the jury." Errors in the admission or exclusion of evidence or the giving or refusal of instructions can mislead or confuse a jury and cause it to return an improper or excessive verdict, but more is required to impeach a jury's motivation in performing its function. Having found no error in the trial court's conduct of the trial and finding in the record no evidence of bias, passion or prejudice on the part of the jury, we deny appellant's request for a new trial.

We have outlined in detail the nature and extent of plaintiff's injuries. Admittedly they consist of a severe neck and back strain, headaches, and loss of sleep. There was some loss of lateral motion in the neck. There was no bone or neurological involvement. To a large extent the findings of pain by the treating and examining physicians were based on plaintiff's subjective complaints. Based on plaintiff's testimony the jury could find that he was unable to perform his usual work, and although defendant offered evidence that lighter work was available to him, the record fails to show that in fact he was tendered a different job. At the time of trial plaintiff's pain had continued for a period of over two and one-half years. He wore a collar while attempting to do heavy work and while driving. He underwent physical therapy without permanent relief. Dr. Bierman and Dr. Schaerer thought he could do light work without severe pain. Dr. Hanaway testified that plaintiff who was then 33 years of age, would have pain the rest of his life even if he stayed at home and did not work. Dr. Schaerer testified that plaintiff would continue to have "substantial activity related pain." Plaintiff's lost wages amounted to $25,148.33.

Defendant unsuccessfully sought a remittitur in the trial court. In this court, as indicated, defendant seeks only the relief of a new trial on the basis of the bias, passion and prejudice of the jury. It is the function of the jury in the first instance to reach a verdict based on the evidence and to award damages, and for the trial court thereafter to give full and careful consideration to the size of the verdict and plaintiff's injuries in passing on the motion for new trial. *Koehler v. Burlington Northern, Inc., supra.* The trial court had the opportunity to observe plaintiff and to evaluate his testimony. Although we would not be inclined to disturb a reasonable order of remittitur in this case had the trial court so ordered, neither are we moved under the evidence on our own motion to find the trial court guilty of an abuse of discretion in sustaining the verdict.

The judgment is affirmed.

STEPHAN, Acting P. J., and GUNN, J., concur.