**Dennis LOCKWOOD, Respondent,**

v.

**Duane S. SCHREIMANN, Defendant ad Litem for Robert S. Wilson, deceased, Appellant.**

**No. WD 51865.**

Missouri Court of Appeals,
Western District.

Sept. 24, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 29, 1996.

Application to Transfer Denied
Dec. 17, 1996.

P. Pierre Dominique, Jefferson City and J. Christopher Spangler, Sedalia, for appellant.

Mark Turley, Rolla, for respondent.

SPINDEN, Judge.

Dennis Lockwood sued Robert S. Wilson for injuries he suffered when the pickup he was driving collided with a car driven by Wilson in Jefferson City. A jury awarded Lockwood $95,465.84 for his injuries, and Wilson [1] appeals.

Wilson charges the circuit court with five points of error: (1) refusing to give an excessive speed instruction to the jury, (2) prohibiting him from cross-examining Lockwood about his claim for worker's compensation for an injury that occurred after the automobile accident, (3) denying his motion to amend the judgment reflecting a credit against the

---

1. Wilson died before trial of this matter, and Duane Schreimann was appointed defendant ad litem for Wilson. For the ease of the reader, we refer to Wilson as the respondent in this case.

judgment for the amount of the worker's compensation settlement Lockwood received, (4) prohibiting him from cross-examining Lockwood's economist as to whether the economist's calculations of Lockwood's past and future earnings loss took into account state and federal taxes, and (5) giving a modified damage instruction to the jury instead of M.A.I. 4.01. We affirm.

## Facts

On June 18, 1990, at about 8:00 A.M., Lockwood was driving his pickup east on Southwest Boulevard in the right-hand through traffic lane[2] as it approached the intersection with Jefferson Street. A tractor-trailer rig had stopped in the left-hand through traffic lane. The traffic light was green for Southwest Boulevard traffic when Lockwood's pickup entered the intersection. Lockwood drove into the intersection at approximately 20 to 30 miles an hour.[3] Wilson's car, traveling west on Southwest Boulevard, turned left into the path of Lockwood's pickup, and Lockwood's pickup crashed into the side of Wilson's car on the passenger side. An investigating police officer cited Wilson with failing to yield the right-of-way. Wilson pleaded guilty to the charge.

## Excessive Speed Instruction

■ In his first point on appeal, Wilson asserts that the circuit court erred in not giving this excessive speed instruction:

> In your verdict you must assess a percentage of fault to plaintiff, whether or not defendant was partly at fault, if you believe:
>
> First, plaintiff drove at an excessive speed, and
>
> Second, plaintiff was thereby negligent, and
>
> Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

Wilson claims that substantial evidence existed from which a jury could conclude that Lockwood drove at an excessive speed under the circumstances. We disagree.

■ The instruction would have been proper only had the record indicated that Lockwood was driving at a speed which, under the circumstances, prevented him from avoiding a collision. *Knox v. Simmons,* 838 S.W.2d 21, 24 (Mo.App.1992). The evidence had to support a finding that Lockwood was driving at an excessive speed and that his vehicle's speed was a direct, contributing cause. *Braniecki v. Mound City Yellow Cab Company, Inc.,* 861 S.W.2d 683, 685 (Mo. App.1993). Although the evidence indicated that Lockwood was driving within the posted speed limit, a jury could still have found him negligent if it determined that he drove at a speed which endangered persons and property under the existing conditions. *Schneider v. Finley,* 553 S.W.2d 727, 731 (Mo.App. 1977). Lockwood was not entitled to rely solely on a favorable traffic signal; "the duty of care to be exercised remains commensurate with the circumstances, one of which is the green light." *Braniecki,* 861 S.W.2d at 685. Because left turns were permitted on a green light at the intersection, the possibility of an oncoming vehicle making a left turn was a circumstance to be considered. *Id.* Whether a particular speed is excessive depends on the conditions of the highway and surrounding circumstances. *Schneider,* 553 S.W.2d at 731. "Particular conditions and circumstances relevant to determining whether speed is excessive include the amount of traffic and road and weather conditions." *Braniecki,* 861 S.W.2d at 685. "Thus, a speed within the posted speed limit may be excessive when maintained on an arterial road, during rush hour, on wet streets, during rain showers at night." *Id.*

Wilson contends that the evidence established that Lockwood was very familiar with the intersection and knew that many vehicles

---

**2.** Southwest Boulevard runs east and west. At its intersection with Jefferson Street, it has four lanes for eastbound traffic: a left turn lane, two center lanes for through traffic, and a right turn lane.

**3.** The posted speed limit on Southwest Boulevard was 30 miles per hour.

traversed it at that time of day.[4] Lockwood admitted that he drove into the intersection at 20 to 30 miles an hour although a tractor-trailer rig stopped in the other through lane obscured his vision of traffic. Lockwood testified:

> Q. And because that tractor-trailer was in the left lane, it obstructed your vision as to the intersection which would be coming from Jefferson Street.
>
> A. Yes, it did.
>
> Q. And you knew that before you came into the intersection, did you not?
>
> A. That my vision was obstructed?
>
> Q. Yes, sir.
>
> A. Yes, I did know that.
>
> Q. Okay. And when you observed that your vision was obstructed and you couldn't see what was coming, say, going south on Jefferson Street, did you slow down any?
>
> A. I'm sure I did.
>
> . . . .
>
> Q. [A]s you came in this intersection and this truck was in the left-hand lane which blocked your vision, you continued to travel at 20 to 30 miles an hour; isn't that correct?
>
> A. Yes.

Wilson argues that this was substantial evidence supporting the excessive speed instruction. He contends that Lockwood had a duty to approach the intersection at a sufficiently reduced speed so that he could control his vehicle and avoid hitting a vehicle in the intersection. Wilson did not establish, however, that the speed at which Lockwood was driving was a direct, contributing cause of the collision. *Roper v. Archibald,* 680 S.W.2d 743, 748 (Mo.App.1984).

■ "Excessive speed is not the proximate cause of a motor vehicle collision unless it prevents the operator of the vehicle traveling at the excessive speed from avoiding the accident; hence it must be shown that the collision would not have occurred except for the excessive speed shown by the evidence."

*Id.* The causal connection between excessive speed and the collision must be established by the evidence and cannot be left to mere speculation and conjecture. *Id.* "This rule, however, does not require that there must be direct proof of the fact itself; it is sufficient if the facts proved are of such a nature and are so connected and related to each other, that the conclusion therefrom may be fairly inferred." *Id.*

Wilson contends that the evidence established that Lockwood's excessive speed caused or contributed to cause this accident. He argues:

> This court can take judicial notice of the fact that a vehicle travels approximately 1.5 feet per second for every mile per hour that the vehicle is traveling. Thus, had Lockwood simply slowed to 25 miles per hour two seconds preceding the impact, his vehicle would have been approximately 15 feet farther back west and there clearly would have been no collision. Had Lockwood slowed to 25 miles per hour one second prior to impact, that would have put his vehicle approximately 7½ feet further west which would have allowed this collision to be avoided, particularly in conjunction with a minor evasive steering input to the left.

Lockwood testified, however, that he was going between 20 and 30 miles an hour. This means that he could have been traveling at Wilson's suggested 25 miles per hour. In light of the speculation about Lockwood's speed, we conclude that Wilson did not establish the causation factor necessary for giving an excessive speed instruction. Wilson improperly left causation to speculation and conjecture.

**Worker's Compensation Claim**

■ In his next point, Wilson contends that the circuit court erred in prohibiting him from cross-examining Lockwood about his claim for worker's compensation for a back injury which occurred on the job after the automobile accident. Wilson asserts that it was a hotly contested issue as to whether

---

4. Lockwood testified that "traffic is much heavier in the 15 to 20 minutes before 8:00 than it is at 8:00 or a few minutes after."

Lockwood's lumbar fusion surgery and medical expenses were a result of the automobile accident or the result of a job-related injury occurring when Lockwood was pushing a car.

The automobile crash injured Lockwood's lower back. He continued working, however, as an auto service manager for a major retail store and sometimes pushed cars into and around the service area. On October 4, 1991, he pushed a car into the service center. The next day, while making a car trip to Cape Girardeau, he experienced increased levels of pain in his right leg to the point that he had difficulty getting out of the car.

Wilson wanted to introduce evidence that Lockwood had prosecuted successfully a worker's compensation claim against his employer. The circuit court refused to permit the evidence pursuant to the collateral source rule. Wilson responded by making this offer of proof:

[Wilson's attorney, P. Pierre Dominique:] Mr. Lockwood, I'm going to ask you whether or not after the October 4th, 1991, accident and injury you filed a claim—

A. Yes, I did.

Q. —for that injury?

A. Yes, I did.

Q. And after you had filed a claim for that injury, did you receive any payment for your injuries in that particular accident?

A. Yes, I did.

MR. DOMINIQUE: And, your Honor, I would like to offer into evidence, which has been admitted by the Plaintiff, a copy of the claim for compensation and a copy of the stipulation for compromised settlement which shows that Mr. Lockwood was paid temporary total compensation in the amount of $8,533.12 and that he received as a permanent partial disability payment $21,357 and that the employer/insurer paid medical expenses in the amount of $37,-009.31.

. . . .

Q. Mr. Lockwood, since you have filed this suit concerning what you claim as the injuries of June 18th, 1990, and since you filed a claim for the injuries on October the 4th, 1991, have you or your lawyer received any lien letter from the Workers' Compensation carrier, which was K–Mart, indicating that if you are successful in your claim against Mr. Wilson that you are obligated to pay back the Workers' Compensation company the amount of money that you received in that particular compensation settlement?

A. I have not received such a letter.

[Lockwood's attorney, Mark E. Turley]: I would stipulate for—

MR. DOMINIQUE: There is no subrogation lien?

MR. TURLEY:—for the benefit of the record that I have not received such a letter as Mr. Dominique indicated in his questioning of Mr. Lockwood. Obviously, Mr. Lockwood can't answer what I have or have not received. But I am his counsel and have not received a letter.

MR. DOMINIQUE: In other words, there is—the Comp carrier is not making any subrogation lien?

MR. TURLEY: Well, I didn't say that. I don't know what their position is.

MR. DOMINIQUE: Well, you haven't received any such notice as counsel?

MR. TURLEY: That's a true statement.

MR. DOMINIQUE: And Mr. Lockwood hasn't either?

MR. TURLEY: That's—

MR. DOMINIQUE: That's all I wanted to find out.

On appeal, Wilson contends that this evidence should have been admitted because it impeached Lockwood's credibility. He argues that the "reasonable inference" of this evidence was that Lockwood had maintained during the workers' compensation proceedings that the mishaps were unrelated.

We reject the contention. Even if we were to agree that the absence of a lien letter established the inference, we fail to understand how Wilson was prejudiced. Wilson called the administrative law judge as his witness. Without identifying the proceedings as involving workers' compensation, Wilson asked the ALJ:

Q. At that time were you informed by Mr. Lockwood that he had an automobile accident which occurred prior to the October 4th, 1991 accident?

A. I was informed by either Mr. Lockwood or [his attorney] that he had had an automobile accident.

Q. Did Mr. Lockwood or [his attorney] make any statement to you concerning the automobile accident?

A. I was told that there was an automobile accident and that it was unrelated to the accident that we were discussing at the time.

Wilson made precisely the point he complains that the denial of his cross-examination would have made. He suffered no prejudice. Nonprejudicial error (assuming that it was error) cannot be the basis for a reversal. *Reed v. Spencer,* 758 S.W.2d 736, 741 (Mo. App.1988).

### "Double Recovery"

█ In his third point, Wilson asserts that the circuit court erred in denying his motion to amend the judgment reflecting a credit against the judgment for the amount of the workers' compensation benefits, $66,899.43. The credit, he asserts, was necessary to avoid Lockwood's "double recovery."

Wilson acknowledges that he cannot find any authority to support his request but argues that his situation is analogous to that contemplated by §§ 490.710 [5] and 537.060 [6], RSMo 1994. We reject his analogy.

The General Assembly did not contemplate a workers' compensation award in these statutes. Section 490.170 restricts its application to payments "predicated on possible tort liability." Section 537.060, too, addresses only actions in tort. Neither applies to a workers' compensation award.

Of more significance is the instruction of the Supreme Court of Missouri. In *Douthet v. State Farm Mutual Automobile Insurance Company,* 546 S.W.2d 156 (1977), the Supreme Court responded to a defendant's argument that the plaintiff would receive a "double recovery:"

[The defendant's double recovery argument] overlooks the fact that such a result regularly occurs when a plaintiff receives payments from a source unconnected with defendant such as hospitalization insurance. In such instances, the collateral source doctrine is applied and the courts consistently hold that the tort-feasor has no right to benefit from such payments.... In this case, the defendant did not create or pay for and was not the source of the workmen's compensation payments received by plaintiff. If defendant company is allowed credit therefore, it receives a windfall[.] [7]

5. Section 490.710.1 says, "No advance payment or partial payment of damages, predicated on possible tort liability, as an accommodation to an injured person, or on his behalf to others, or to the heirs at law or dependents of a deceased person, of medical expenses, loss of earnings and other actual out-of-pocket expenses, because of an injury, death claim, property loss or potential claim against any person shall be admissible into evidence as an admission against interest or admission of liability by such party or self-insurer, or if paid by an insurer of such party, as the insurer's recognition of such liability with respect to such injured or deceased person, or with respect to any other claim arising from the same accident or event."

6. Section 537.060 says, "Defendants in a judgment founded on an action for the redress of a private wrong shall be subject to contribution, and all other consequences of such judgment, in the same manner and to the same extent as defendants in a judgment in an action founded on contract. When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury ..., such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater. The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor. The term 'noncontractual indemnity' as used in this section refers to indemnity between joint tortfeasors culpably negligent, having no legal relationship to each other and does not include indemnity which comes about by reason of contract, or by reason of vicarious liability."

7. We recognize that in *Douthet* the Supreme Court relied on a public policy argument that the Safety Responsibility Law should not be diminished by contractual limitation, in the absence of express statutory authority; however, we believe

*Id.* at 159–60. Earlier, the Supreme Court said, "The fact of payment ... under the [workers'] compensation act with consequent pro tanto subrogation of the employer ... is no defense to the action.... Nor will it operate to reduce the damages recoverable from one responsible for the loss." *Pritt v. Terminal Railroad Association of St. Louis,* 251 S.W.2d 622, 625 (1952). The circuit court correctly applied the rule enunciated by this court in *Taylor v. Associated Electric Cooperative, Inc.,* 818 S.W.2d 669, 672 (Mo.App. 1991), that "[a] wrongdoer is not entitled to have his liability for damages reduced by [proving] that a plaintiff has received compensation from a collateral source."

### Economist's Calculations

■ Next, Wilson contends that the circuit court erred in prohibiting him from cross-examining Lockwood's economist as to whether the economist considered state and federal taxes in calculating Lockwood's past and future earnings. Wilson argues that Lockwood was entitled to damages only for his net wage loss; therefore, asking the economist whether his figures were based on gross or net wages was a proper subject of cross-examination.

■ We need not decide whether the tax subject was an appropriate one for cross-examination because Wilson's contention fails for two reasons. First, except in a few situations which are not applicable here, "whenever there is an allegation of error which pertains only to the issue of damages, appellant must brief a separate point demonstrating that the verdict was excessive as a result of that particular allegation of error." *Myers v. Bi–State Development Agency,* 567 S.W.2d 638, 643 (Mo. banc 1978); *Amos v. Altenthal,* 645 S.W.2d 220, 224 (Mo.App.1983). Wilson did not claim, by a separate point, that the verdict was excessive.

■ Second, Wilson did not make an offer of proof once the circuit court sustained the objection to the question of taxes. The general rule is that nothing is preserved for appellate review when a court rejects evi-

dence in the absence of an offer of proof. *Brazell v. St. Louis Southwestern Railway Company,* 632 S.W.2d 277, 284 (Mo.App. 1982). In the *Brazell* case, the defendant asserted that the trial court knew that the testimony which he wanted to adduce from the plaintiff was that his lost wages would have been subject to some tax liability. This court's eastern district held: "What, if any, taxes plaintiff would have been subjected to is dependent on too many variables and we would have to engage in pure speculation to make such determination." *Id.* The *Brazell* court concluded that without an offer of proof the point was not preserved for its review. Hence, Wilson's point is not preserved.

### Damage Instruction

■ In his last point on appeal, Wilson asserts that the circuit court erred in giving a modified damage instruction to the jury instead of M.A.I. 4.01. The instruction given by the circuit court said:

> If you find in favor of the Plaintiff, then you must award the Plaintiff such sum as you believe will fairly and justly compensate Plaintiff for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence of June 18th, 1990, and for any such damages as you believe the Plaintiff sustained and is reasonably certain to sustain in the future as a result of the occurrence of October 4th, 1991, if you believe such injuries were either caused or contributed to by the injuries sustained in the occurrence of June 18th, 1990.

Wilson contends that this instruction constituted an improper deviation from an applicable M.A.I. by misstating the law. He asserts that it improperly required the jury to award Lockwood all damages sustained by him in the subsequent work-related injury if it found that the work-related injury was caused in any part by the automobile accident. We disagree.

a similar rationale would apply in this case, especially in light of *Pritt v. Terminal R.R. Ass'n*

*of St. Louis,* 251 S.W.2d 622 (Mo.1952).

As this court said in *Chaussard v. Kansas City Southern Railway Company,* 536 S.W.2d 822, 829 (Mo.App.1976):

> Missouri follows the general rule that a person injured due to negligence of another is entitled to recover all damages proximately traceable to the original negligence, including subsequent aggravation which the law regards as a natural result of the original injury, even though some intervening agency may have contributed to the result.

To submit the question of Wilson's liability for Lockwood's work-related injuries, Lockwood had to show only that the automobile accident, which was caused by Wilson, caused or contributed to cause the work-related injury. *Id.*

Lockwood's evidence established that the automobile accident caused or contributed to his work injury. Lockwood's treating physician testified that, in his expert medical opinion, the automobile accident contributed to Lockwood's work injury:

> [Lockwood] had received the injury in June of 1990. It had weakened his muscles and his back. They never did fully heal and return back to normal. And when he suffered the second injury in October of 1991, it further aggravated a condition that he had and the weakness in the muscles, leaving him prone to injury, is the reason that the previous accident caused— at least contributed to the second injury.

The doctor said that the automobile accident caused permanent, chronic symptoms in Lockwood's lower back and that his back was "in a weakened condition, and so he was at risk for further trouble." Another treating physician said in Lockwood's medical chart:

> This patient has a diagnosis of spondylolisthesis L5–S1. It is my opinion that the MVA, "motor vehicle accident" precipitated the chronic low back pain that the patient is suffering at this date. The patient also had some type of work related strain/sprain that occurred; however, it is unlikely that this would have happened had he not been suffering from the previous injury resulting from the MVA, "motor vehicle accident[.]"

Based upon this evidence, we conclude that the circuit court did not err in giving the modified damage instruction. The instruction was supported by substantial evidence.

Wilson argues that *Chaussard* did not deal with the issue of whether the instruction is a misstatement of the law. He contends that the instruction in this case and in *Chaussard* misstates the law by requiring the jury to award plaintiff all damages sustained by the plaintiff in a second accident if the first accident played any part in the second accident. We disagree. This is the very issue that *Chaussard* addressed, and the court concluded that to submit the instruction the plaintiff had to show only that the first accident caused or contributed to the second accident.

We affirm the judgment of the circuit court.

LOWENSTEIN, P.J., and HANNA, J., concur.